**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| ALLTRU FEDERAL CREDIT UNION, f/k/a 1st FINANCIAL FEDERAL CREDIT UNION, | ) )  ) |
| Plaintiff, | ) ) |
| v. | )  Case No. 4:21-CV-1334-JAR ) |
| STARNET INSURANCE COMPANY, | ) ) |
| Defendant. | ) ) |

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**</u>

COMES NOW plaintiff Alltru Federal Credit Union ("Alltru"), by and through undersigned counsel, and for its opposition to defendant's Motion to Dismiss states as follows:

**I.       INTRODUCTION AND PROCEDURAL HISTORY.**

This is an action seeking insurance coverage and related damages.  Plaintiff Alltru is a federal credit union.  During all relevant times, defendant StarNet Insurance Company ("StarNet") insured 1st Financial Federal Credit Union, n/k/a Alltru Federal Credit Union, (hereinafter referred to as "Alltru"), under a claims-made Management Liability Insurance Policy.  (StarNet Insurance Policy, attached as Ex. A.)

Alltru was the defendant in a consumer class action lawsuit filed in The Circuit Court of the City of St. Louis, Missouri.  (First Amended Petition in underlying lawsuit, attached hereto as Ex. B.)  The plaintiff class asserted numerous causes of action, including: alleged violations of the Uniform Commercial Code contained in pre- and post-sale notices sent in connection with disposition of repossessed collateral; and claims of defamation, slander, libel and invasion of privacy that resulted from Alltru's sending of false credit reports of class members to credit reporting agencies.

Notice of the lawsuit was provided to StarNet and demand was made demand on StarNet to defend the lawsuit and indemnify Alltru from any resultant damages to the extent of StarNet's policy limits.  On July 23, 2019, StarNet issued a reservation of rights letter which accepted the duty to defend but reserved certain rights to deny coverage for indemnity.

On March 11, 2020, StarNet, through counsel Bailey Cavalieri, acknowledged coverage under Coverage E and denied coverage under Coverages I and K. On April 6, 2020, undersigned counsel for Alltru contested the coverage denials and set forth the factual and legal reasons why StarNet's positions were incorrect and why Alltru was entitled to indemnity coverage under Coverages I and K. On April 17, 2020, StarNet's counsel reaffirmed its prior position that there was no coverage under Coverages I and K. On April 29, 2020, StarNet's counsel sent a corrected version of its April 17, 2020, letter to correct a formatting error. StarNet did not properly reserve rights on all defenses upon which it now relies. (Copies of these letters are attached as composite Ex. C).

Alltru subsequently reached a settlement with the class action representatives.  The settlement agreement is now final and, by the time the Court considers the instant motion, the final approval will have been issued. (A copy of the Class Action Settlement Agreement and Release is attached as Ex. D. The Order of approval will be submitted at the time of entry).

StarNet continues to deny coverage under Insuring Agreements I ("Third-Party Harassment Liability") and K ("Electronic Publishing Liability").  Agreement I has limits of $1 Million and Agreement K has limits of $2 Million.

This lawsuit was filed in Missouri state court and was then removed to this Court on diversity grounds. StarNet filed a Motion to Dismiss which asserts various reasons as to why no coverage exists under Agreements I and K. StarNet also raised two procedural issues in Footnote

1 on page 2 of their Memorandum. The first issue involves the ripeness claim, which will be moot as soon as the state court gives final approval to the settlement.

StarNet also complains that Alltru improperly included in its Complaint[1] a reference to positions taken by StarNet during a mediation between Alltru and the attorneys for the class; to-wit: that StarNet's policy only provided coverage under Agreement E. Alltru did not and does not consider the positions taken by an insurer, which was not a party to the mediation and with no claims made against it, to fall within some blanket privilege. However, this issue is moot inasmuch as StarNet has taken the position in the very Motion at issue that it has no coverage other than under Insuring Agreement E. They have reaffirmed the position they took at the mediation. Nevertheless, Alltru is willing to amend its Complaint to remove any reference to statements made by StarNet's representatives during the mediation if necessary.

## II.     ARGUMENT AND AUTHORITIES.

### A.     Legal Standards.

#### 1.     Motions to dismiss.

This Court recently articulated the legal standard employed when deciding a motion to dismiss under FED. R. CIV. P. 12(b)(6) as follows:

> Fed. R. Civ. P. 12(b)(6) provides for a motion to dismiss based on the failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. In the complaint, a plaintiff must include sufficient factual information to provide the grounds on which his claims rest, and to raise a right to relief above a speculative level.
>
> This obligation requires a plaintiff to plead more than labels and conclusions and a formulaic recitation of the elements of a cause of action will not do. A complaint must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory. This standard

---

[1] A Missouri Petition was the initiating pleading, but we will use the term Complaint in this response.

> simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the claim or event.
>
> In reviewing the pleadings under this standard, the Court must accept all of the plaintiff's factual allegations as true and draw all inferences in the plaintiff's favor, but the Court is not required to accept the legal conclusions the plaintiff draws from the facts alleged.

*Schlafly Trust v. Cori,* 512 F. Supp. 3d 916, 924 (E.D. Mo. 2021) (Ross, J.) (internal citations and punctuation omitted).

### 2.   Missouri law regarding contract construction applies to insurance coverage disputes.

Missouri state law governs the interpretation of insurance contracts where, as here, jurisdiction of the federal court is based upon diversity of citizenship.  *E.g., Secura Insurance v. Horizon Plumbing, Inc.,* 670 F.3d 857, 861 (8th Cir. 2012).

StarNet's analysis of this standard as applied to insurance coverage questions is correct but incomplete. StarNet wishes to limit determination of the coverage issues to what was alleged in the First Amended Petition in the class action lawsuit. In actuality, "the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. 1999).

The cardinal rule when interpreting a contract is for the Court to ascertain, and give effect, to the intention of the parties.  *E.g., J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973).  If contractual terms are not ambiguous, the Court will determine the intention of the parties, and construe the meaning of the contract from within the four corners of the contract itself.  *E.g., Eveland v. Eveland,* 156 S.W.3d 366, 368 – 69 (Mo. App. 2004).

Ambiguity arises when contract terms are susceptible to more than one meaning, when viewed from the four corners of the contract alone. *Eveland,* 156 S.W.3d at 369. The presence of ambiguity is based upon a reasonable person test, and whether reasonable people "could fairly and honestly differ in their construction of the terms." *Id.; Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. 2007) (ambiguity exists where contract terms are "reasonably open to different constructions")(citation omitted). "[D]uplicity, indistinctness or uncertainty in the meaning of the language of the policy" constitutes ambiguity. *Seeck,* 212 S.W.3d at 132. "Ambiguity depends on context. Contract language is not interpreted in a vacuum, but by reference to the contract as a whole." *Purcell Tire & Rubber Co. v. Executive Beechcraft, Inc.,* 59 S.W.3d 505, 510 (Mo. 2001) (citation omitted).

In *Farm Bureau Town & Country Ins. Co. of Missouri v. Schmidt,* 751 S.W.2d 375, 376 (Mo. banc 1998), the Missouri Supreme Court stated: "An insurance policy, being a contract designated to furnish protection will, if reasonably possible, be construed so as to accomplish that objective and not defeat it. Hence, if the terms are susceptible to two possible interpretations and there is room for construction, provisions limiting, cutting down, or avoiding liability on the coverage made in the policy are construed most strongly against the insurer."

The insurer, of course, is in the better position to remove ambiguity because it drafted the contract of insurance and is most knowledgeable of the subject matter. *Krombach v. Mayflower Ins. Co.,* 827 S.W.2d 208, 211 (Mo. 1992). Thus, ambiguity is resolved in favor of the insured, and consistent with the insured's objectives and reasonable expectations concerning the nature and scope of the coverage it purchased. *See, e.g., Niswonger v. Farm Bureau Town & Country Ins. Co. of Missouri,* 992 S.W.2d 308, 317 (Mo. App. 1999).

   **3.**   **Missouri law regarding defined and undefined terms in an insurance contract.**

Where an insurance "policy defines a term, courts will normally look to that definition and

nowhere else to determine its meaning." *Ferguson v. St. Paul Fire & Marine Ins. Co.,* 597 S.W.3d

249, 256 (Mo. App. 2019).  When a term contained in a policy of insurance is "clearly defined,"

the "policy definition controls." *John Patty D.O., LLC v. Mo. Professionals Mut. Physicians Prof'l

Indem. Ass'n,* 572 S.W.3d 581, 588 (Mo. App. 2019).

 Where a term in the policy is not defined, "it should be given its common or usual meaning,

or the meaning the policyholder would give it, not the insurer's technical definition."  *Camden v.

State Farm Mut. Auto. Ins. Co.,* 66 S.W. 3d 78, 81 (Mo. App. 2001).  When construing an insurance

contract, the court will give undefined "terms their ordinary meaning, which is the meaning that

the average layperson would reasonably understand, and 'to determine the ordinary meaning of a

term, this Court consults standard English language dictionaries.'"  *Ferguson,* 597 S.W.3d at 256,

citing *Martin v. U.S. Fid. & Guar. Co.,* 996 S.W.2d 506, 508 (Mo. banc 1999).

Any doubt about a term's meaning are to be resolved in the insured's favor.  *John Patty,*

572 S.W.3d at 588 (Mo. App. 2019), citing *Golden Rule Ins. Co. v. R.S.,* 368 S.W.3d 327, 338

(Mo. App. 2012).

## III.   COVERAGE EXISTS UNDER INSURING AGREEMENT I OR, AT A MINIMUM, A JUSTICIABLE CONTROVERSY EXISTS ON STARNET'S COVERAGE OBLIGATIONS

### A.   The underlying class action suit and the terms of the settlement contain sufficient allegations and admitted facts to trigger coverage under Agreement I of Alltru's insurance policy.

#### 1.  The absence of punctuation limits the policy's definition.

StarNet's sole basis for its argument that there is no coverage under Insuring Agreement I

is that there were no allegations in the class action case of a "Third-party harassment act".  In

particular, StarNet claims that, because the defamation, libel, slander, disparagement or invasion

of privacy occurred as part of a lending act, it does not fall within the definition of what was covered under this section of the policy.  There are two flaw in this argument. First, StarNet completely ignores the punctuation that it chose in drafting the definition of "Third-party harassment act." Second, even if the "lending act" limitation applies, the act of sending credit reports to credit reporting agencies does not fall within StarNet's definition of that term.

In Missouri, punctuation is important in the interpretation of insurance policies. For example, in the case of *Dry v. United Fire & Cas. Co.*, 420 S.W.3d 593 (Mo. Ct. App. 2013), the policy provided coverage for bodily injury or property damage caused by an "insured." Included in the definition of the term "insured" were volunteer workers. The policy defined a "volunteer worker" as

> a person who is not your "employee", who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

The case hinged on whether a non-employee who caused injury to another person was considered a volunteer worker. The plaintiff argued that the last portion of the definition of "volunteer worker" expanded the scope of who may provide direction to a "volunteer worker." The court disagreed, saying: "The portion of the definition discussing the scope of the worker's duties is modified by the phrase "by you" while the portion of the definition discussing payment of the worker is modified by the phrase "by you or anyone else for their work performed for you." The two requirements are separated by a comma and a conjunction. This structure suggests the two requirements are separate and the modifying phrases apply only to the requirement to which they are closest: the phrase "by you" applies to the phrase describing the direction of a volunteer worker and the phrase "by you or anyone else" applies to the phrase describing the payment of a volunteer worker." *Dry, supra at* 596-97, (internal citations omitted).

7

Judge Webber of this Court addressed a similar issue in *Fluor Corp. v. Zurich Am. Ins. Co.,* No. 4:16CV00429 ERW, 2021 U.S. Dist. LEXIS 138047 (E.D. Mo. July 25, 2021). In that case the court was called upon to interpret the following endorsement:

> LIMITS OF LIABILITY FOR COMPREHENSIVE GENERAL LIABILITY AS DESIGNATED UNDER ITEM 3 OF THE POLICY DECLARATIONS IS AMENDED TO READ:
>
> 500,000 EACH CLAIM
>
> 500,000 EACH AGGREGATE AS RESPECTS INCIDENTAL PROFESSIONAL LIABILITY ENDORSEMENT.

The court rejected an argument that these limits were separate limits applying to different types of coverage, stating: "It strains credulity to think the phrase "500,000 EACH CLAIM" would be left blank as to the type coverage it applied to, while the second phrase immediately below it for the aggregate limit specifically references an entirely different type of coverage. The Court declines to create ambiguity where none exists and will read policies as a whole. Moreover, the two phrases ("500,000 EACH CLAIM" and "500,000 EACH AGGREGATE") follow a colon and form part of the same sentence unseparated by punctuation, indicating the modifying phrase at the end ("AS RESPECTS INCIDENTAL PROFESSIONAL LIABILITY ENDORSEMENT.") applies to both clauses. <u>When interpreting a contract, punctuation is to be considered to the extent it aids in interpreting the meaning of language, such as aiding in the determination of what preceding phrases or phrase is modified by a succeeding phrase.</u> *Cf. Dry v. United Fire & Cas. Co., Inc.*, 420 S.W.3d 593 (Mo. Ct. App. 2013), reh'g and/or transfer denied, (July 15, 2013) and transfer denied, (Oct. 1, 2013) (ruling that two policy requirements that are separated by a comma and a conjunction indicate that "the two requirements are separate, and the modifying phrases apply only to the requirement to which they are the closest")." *Supra at* 24-25. (emphasis added).

8

Missouri courts have repeatedly considered and applied the rules of punctuation in the interpretation of insurance policies. In *State Farm Mut. Auto. Ins. Co. v. Chambers,* 860 S.W. 2d 19 (Mo. App. 1993), the court was called upon to construe the definition of "Each Person" in determining the amount of coverage that was available under the policy. The provision stated: "Under "Each Person" is the amount of coverage for all damages, including damages for care and loss of services, arising out of and due to **bodily injury** to one **person."**

In this regard, the opinion stated: "The punctuation of the sentence also makes its meaning clear. The phrase "including damages for care and loss of services" is set off by commas and functions to explain the term "all damages." For the prepositional phrase "to one person" to refer to "all damages" then the phrase "arising out of and due to bodily injury" likewise would have to be set off by commas. It is not; there is no comma after "injury." Because there is no comma, it is apparent that "arising out of and due to bodily injury to one person" is to be treated as a unit, as one phrase that modifies "all damages.") *Id. at p. 21.*

In *John Drennon & Sons Co. v. N.H. Ins. Co.,* 637 S.W.2d 339, 340-41 (Mo. App. 1982), the court interpreted the insurance policy to ascertain whether there was coverage under the policy issued to the plaintiff whose truck crane was damaged while it and another crane owned by plaintiff were being used to move a microwave tower. Plaintiff's primary business was renting cranes. While the tower was suspended in midair, the upper end of it buckled and fell against the crane, damaging it. The repair cost exceeded the policy limit of $25,000. A portion of the policy stated:

> THIS POLICY INSURES MACHINERY AND EQUIPMENT OF ALL TYPES AND MATERIALS INCIDENTAL THERETO, THE PROPERTY OF THE ASSURED, THE PROPERTY OF OTHERS WHICH THE ASSURED HAS AGREED TO INSTALL, HOIST, LOWER OR SET IN POSITION, WHILE IN TRANSIT, DURING LOADING OR UNLOADING AND WHILE

TEMPORARILY LOCATED WHERE SUCH PROPERTY IS TO BE INSTALLED.

Relying on this provision of the policy, the defendant contended that plaintiff failed to make a submissible case because it failed to prove that the damaged crane was machinery or equipment which plaintiff had "agreed to install, to hoist, or to set in position, while in transit, during loading or unloading and while temporarily located where such property is to be installed."  The plaintiff claimed that the policy covered the crane without regard to any other conditions and that the language relied upon by the defendant was relevant only to show when property of others is covered.

The court sided with the plaintiff, stating: "The clause beginning, 'THE PROPERTY OF OTHERS WHICH THE ASSURED HAS AGREED TO INSTALL', does not have a comma after "OTHERS", and that leads us to believe that the portion of the paragraph on which defendant relies only refers to the property of others. Defendant asserts that we should ignore the punctuation, but we decline to do so. While punctuation may not be controlling, we believe it is to be considered. See *Johnson v. Flex-O-Lite Manufacturing Corporation*, 314 S.W.2d 75, 84 (Mo. 1958); *Harnden v. Continental Insurance Company*, 612 S.W.2d 392,  394 (Mo.App. 1981). The best we can say for defendant's contention is that this provision of the policy might be ambiguous. If so, we would construe it in favor of plaintiff. *Heshion Motors, Inc. v. Western International Hotels*, 600 S.W.2d 526, 537-538 (Mo.App. 1980). Under either approach the plaintiff's interpretation would prevail." *Id at p. 341.*

In *Naucke v. Mo. Pub. Entity Risk Mgmt. Fund*, 95 S.W.3d 166, 166-67 (Mo. Ct. App. 2003), the plaintiffs appealed an order granting summary judgment in favor of the Missouri Public Entity Risk Management Fund (MOPERM).  The plaintiffs sued MOPERM seeking to recover the punitive damage portions of judgments granted against a city employee covered by

10

the Fund. The court interpreted the Memorandum of Coverage to arrive at its conclusion.  The

applicable language stated:

> This memorandum does **not** apply:
> \* \* \*
> M. To punitive and exemplary damages, fines or penalties threatened or imposed
> for violation of any civil or criminal statute, administrative regulation or county or
> municipal ordinance.

The plaintiffs contended that the language beginning "threatened or imposed" applied to

both "punitive and exemplary damages" and "fines or penalties," and that the policy language

was ambiguous.

The court rejected that argument, stating: "The punctuation within the memorandum

exclusion also confirms the validity of the Fund's argument. A comma separates the "punitive

and exemplary damages" clause from the remainder of the exclusion. In our view, that comma

divides the provision into two portions, creating an exclusion for punitive damages and a

separate exclusion for fines or penalties threatened or imposed for violation of any civil or

criminal statute, administrative regulation, or county or municipal ordinance. As such, the

structure of the language compels the conclusion that the policy exclusion for punitive damages

is not limited to damages imposed or threatened due to violation of a statute, ordinance, or

similar provision. We find no ambiguity in the exclusion, and we conclude that the language of

the memorandum of coverage expressly excludes coverage for all punitive damages." *Id at p.

171.*

The lesson of *the authority cited above* is that the presence or absence of punctuation

marks governs how a particular phrase or section of an insurance policy is to be interpreted.[2] It

---

[2] See, for example, US Government Printing Office's Style Manual. It states as follows for the proper use
of semicolons: "To set off explanatory abbreviations or words that summarize or explain preceding matter."

must also be borne in mind that, "[P]olicy provisions designed to restrict, limit or impose exceptions or exemptions on insurance coverage are strictly construed against the insurer." *Am. Family Mut. Ins. Co. v. Bramlett*, 31 S.W.3d 1, 4 (Mo. Ct. App. 2000).

Here, the definition of "Third-party harrassment act" appears exactly in StarNet's policy as follows:

> **RR.Third-party harassment act** means any actual or alleged:
>
> a. violation of any federal, state, provincial or local statutory law, common law or civil law prohibiting discrimination of any kind;
> b. harassment, including any type of sexual, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment;
> c. defamation, libel, slander, disparagement or invasion of privacy;
> d. false arrest, false imprisonment or malicious prosecution; or
> e. bullying
> of a natural person other than an **employee**, **officer or director** and other than as a part of a **lending act**

( Ex. A at p. 00023.)

Based upon the rules of construction and punctuation detailed above, StarNet's position hinges upon the phrase "and other than as a part of a lending act" serving as a modifier of sections a – e of the definition. This would require a finding by this Court that the word "bullying" should be interpreted as though there was a semicolon after it. In drafting the policy provision as stated, StarNet chose not to follow "e. bullying" with a semicolon, whereas it clearly used semicolons to denote the end of the clauses in the prior subsections, a. through d. In essence, StarNet considers a line skip to be the equivalent of a semicolon, although such an interpretation has no support under Missouri law or well-established rules of sentence construction. Notably, in *Flour,* there was a line skip between the two sentences without punctuation separating them. Judge Webber clearly did not consider the line skip to act as a substitute for punctuation.

The absence of the semicolon means that the modifier "other than as a part of a lending act" applies only to subpart e. bullying.  The result is that subsection "c. defamation, libel, slander, disparagement or invasion of privacy;" is not limited by the clause "other than as a part of a lending act" and the class plaintiffs' claims for defamation would meet the definition of Third-party harassment act and be entitled to coverage under Insuring Agreement I.

At a minimum, an ambiguity exists on the meaning of this definition. "Language is ambiguous if it is reasonably open to different constructions." *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690 (Mo. banc 2009) (quoting *Seeck v. Geico General Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007)). As stated above, "Any doubt about a term's meaning are to be resolved in the insured's favor."  *John Patty,* 572 S.W.3d at 588 (Mo. App. 2019). Under either approach, Alltru's interpretation would prevail.

### 2. The reporting of credit information is not a "lending act" as that term is defined in the policy. Alternatively, the definition is ambigous and, at a minimum, creates a question of fact.

Even if this Court concludes that the phrase "and other than as a lending act" applies to all subsections of the third-party harassment act definition, StarNet's definition of "lending act" does not cover the conduct that gave rise to the defamation and slander claims in the first instance.  StarNet's policy defines a "lending act" to mean:

> … any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a **director**, **officer**, **employee** or the **company**, in connection with or relating to:
>
> a. an agreement to or refusal to grant or extend a loan, lease or extension of credit;
> b. the granting or extending of a loan, lease or extension of credit;
> c. loan servicing, including the servicing of loans for others under a contract or agreement; or
> d. the restructure, termination, transfer, repossession or foreclosure of a loan, lease or extension of credit.

(Ex. A at p. 00021.)

13

StarNet tries to escape this reality by arguing that the "substance" of the underlying lawsuit is based on financing activities or lending acts that are attributable to the deliberate repossession of vehicles.  That characterization completely ignores the fact that claims for defamation, slander and libel arose from Alltru's reporting of false information concerning the credit history of class members to credit reporting agencies.

In the Bailey Cavalieri letter of March 31, 2020, StarNet asserted that "reporting of false derogatory information on the class members' credit reports fall squarely within subsection (d) of the definition of Lending Act because those alleged actions constitute an alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a Director, Officer, Employee or the Company, in connection with or relating to the repossession of a loan, lease or extension of credit." (Ex. C, at p. 7).

With StarNet conceding that sections a-c of the definition do not apply, we will focus on section d.  The question is whether the reporting of credit information concerning Alltru's borrowers is "in connection with or relating to… the restructure, termination, transfer, repossession or foreclosure of a loan, lease or extension of credit."  Clearly the restructure, termination and transfer language does not apply.  Thus, the question before the Court is whether the reporting of credit information of credit union borrowers is connected with or relating to "the repossession or foreclosure of a loan, lease or extension of credit."  There is no legitimate basis for the Court to make such a finding.  If the definition of "lending act" is so broad as to extend to routine reporting of credit information to credit reporting agencies, everything a credit union does would fall within the definition and would effectively nullify all coverage under this Agreement.  Such an interpretation is advocated by StarNet would render the coverage

14

supposedly provided such Coverage I illusory.  As stated by the Missouri Supreme Court, "a construction which would render a portion of the policy illusory should not be indulged in."  *Cano v. Travelers Ins. Co.*, 656 S.W.2d 266, 271 (Mo. banc 1983).

StarNet advocates the case of *Landers Auto Group No. One, Inc. v. Cont'l Western Ins. Co.,* 621 F.3d 810 (8th Cir. 2010) as a basis for expanding the definition of "lending acts" beyond what is found in its policy.  In *Landers*, the court was construing an insurance policy covering garage operations. It determined that the allegation a vehicle had been improperly repossessed was not a garage operation and not covered under the garage operations policy, because "it is not an activity associated with operation of a garage but of the financing activities of the dealership."  The court's description of repossession as involving the "financing activities of the dealership" was *dicta* in that case (because that case dealt with coverage for garage operations).  Moreover, that case pertains to repossessions and not the electronic reporting to credit reporting agencies.

More importantly, the *Landers* opinion is irrelevant to the meaning of a defined term in StarNet's policy. StarNet is not free to borrow language from federal statutes, case law, or other companies' insurance policies to supplant the definitions it elected to include in its own policy. *See, e.g., Farmland Indus.,* 941 S.W.2d at 508, 512 (rejecting insurer's attempt to engraft statutory definition into insurance policy)*; Ferguson,* 597 S.W.3d at 256 (where terms are defined in insurance policy, court will look to policy definitions and nowhere else).

Equally unavailing is StarNet's reliance on *Anheuser Busch Empl. Credit Union v. Travelers Prop. Cas. Co. of Am.,* 2020 WL 1675685; 2020 U.S. Dist. LEXIS 59933 (Apr. 6, 2020). In *Anheuser Busch,* the district court considered whether there was insurance coverage for slander and libel claims asserted against Anheuser Busch arising out of false credit reports sent to credit reporting agencies.  The court concluded that there was no coverage because of a professional

15

services exclusion, which specifically excluded claims involving "checking or reporting of credit". *Id* at p.13. There is no such exclusion in StarNet's policy.  In fact, the relevant language in the two policies is not even remotely comparable. (Ex. A at p. 00021.)  StarNet cannot simply borrow language and exclusions from other places to supplant or embellish the definitions it has elected to include in its own policy.  *See, e.g., Farmland Indus.*

There were clear and specific allegations of defamation, slander, libel and invasion of privacy in the class-action First Amended Petition (Ex B at ¶¶ 30 and 31). These claims fall squarely within StarNet's definition of "Third-party harassment".

 In addition, even if the lending act restriction is deemed to apply, the electronic transfer of credit information to credit reporting agencies does not fall within StarNet's definition of "lending act".  Thus, coverage is clearly available under Coverage I.

In the alternative, due to the uncertainty of the meaning of "lending act" and how, if at all, it applies to the claims of defamation, etc., the definition is ambiguous and must be construed against StarNet.  At a minimum, a question of fact exists as to whether the electronic transmission of credit reports to credit reporting agencies falls within the definition of "lending act".  For all of these reasons, StarNet's Motion as to Coverage I should be denied..

## IV.   COVERAGE EXISTS UNDER INSURING AGREEMENT K OR, AT A MINIMUM, A JUSTICIABLE CONTROVERSY EXISTS ON STARNET'S COVERAGE OBLIGATIONS.

### A. Coverage exists for allegations of defamation, slander and libel

StarNet contends that there is no coverage under Insuring Agreement K because the class action lawsuit did not allege an electronic publishing act. That is simply not correct.  The policy defines electronic publishing act to include "any actual or alleged…libel or slander resulting from the electronic publishing of material that defames a person…."  (Ex. A at p.00019.)  Also included

16

in the definition is "any actual or alleged…violation of the right of privacy…of any person…by the electronic publishing of material that publicly discloses private facts…."

The policy defines electronic publishing liability to include any "loss" which the "company" becomes "legally obligated to pay as a result of any claim first made against [it]…for an electronic publishing act…."  (Ex A at p.00016.)

The class action lawsuit alleged precisely the type of conduct described above.  The First Amended Petition claimed that Alltru reported "false or inaccurate derogatory information" on the "credit reports" of class members by way of "oral or written publication of material that defames, slanders, or libels the class members."  (Ex. B at ¶ 30.)  It also alleged that Alltru's "reporting" of such "false or inaccurate derogatory information" was "oral or written publication of material that invaded the…privacy rights" of the class action plaintiffs.  (Ex. B at ¶ 31.)

StarNet argues there is no coverage because the pre-and post sale notices were mailed to class members and therefore did not constitute electronic publication.  This argument completely misses the mark.  The alleged electronically published defamation, slander, libel and invasion of privacy did not involve the mailing of the notices, but was the result of the electronic transmission of false credit information to and from credit reporting agencies. StarNet ignores the description of released claims found in the settlement agreement, which includes "any claim related to or arising out of Alltru's electronic delivery and publication to three credit reporting agencies information which was in accurate and harmful to the credit of Class Members…." (Ex. D at p. 8).  As indicated above, the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement.  Thus, language from the settlement agreement must be considered.

17

Moreover, an insurer may not ignore 'actual facts,' that is, 'facts which were known, or should have been reasonably apparent …." *McCormack Baron Mgt. v. American Guarantee,* 989 S.W.2d 168, 170-171 (Mo. banc 1999).  Facts which were known and were reasonably apparent include the fact that Alltru electronically reported credit information to credit reporting agencies, who in turn made that information available to other parties, such as banks and lenders. Not only was StarNet informed of this in responses to the reservation of rights letters, Alltru is more than prepared to prove that incorrect credit information was regularly, electronically delivered to credit reporting agencies as Alltru's agents in the process of electronically reporting the subject credit information to the public.

**B.  Coverage exists due to allegations of invasion of privacy.**

StarNet also argues that the electronic transmission of inaccurate credit information to credit reporting agencies does not constitute a public disclosure, and therefore cannot constitute an invasion of privacy.  This argument is fallacious.  "Electronic publishing act" is defined to include claims for "violation of a right of privacy…of any person…by the electronic publishing of material that publicly discloses private facts…."  (Ex. A at p.00019.)  Credit unions such as Alltru routinely electronically transmit credit reports on borrowers to credit reporting agencies. Those agencies compile credit information on individuals which are made available to banks and lenders and which constitutes public disclosure.

At best StarNet's argument creates a question of fact as to whether there was a public disclosure and, thus, it is not appropriate for this dispositive motion.  Also, even if correct, this argument would only pertain to the invasion of privacy claim and would have nothing to do with defamation, libel and slander, which are all specifically covered.

**V.     THE FAIR CREDIT REPORTING ACT.**

    **A.  The Fair Credit Reporting Act does not bar coverage.**

StarNet argues that it cannot be liable to its insured as a matter of law because Alltru has

not suffered any loss under the insurance policy. According to StarNet, the Fair Credit Reporting

Act ("FCRA"), 15 U.S.C. §1681 *et seq.*, preempts state law tort claims unless the plaintiff pleads

and proves willful conduct. Under StarNet's theory of the case, because Alltru could not be liable

under any theory other than violations of FCRA, Alltru did not incur a loss because there were no

allegations of intentional or willful conduct.  In essence, StarNet argues that because Alltru settled

claims for which StarNet believes Alltru had no liability under the FCRA, StarNet's policy need

not respond.

This position is devoid of merit, both factually and legally. The state tort claims were ***in***

***fact*** settled as part of a global settlement of class action claims against Alltru.

StarNet's obligation fits within the policy's definition of "loss," which includes "any

amount" the insured "becomes legally obligated to pay as the result of a claim, including …

settlements…."  (Ex. A at p.00021.)  Likewise, there is no question the class action plaintiffs

asserted a "**claim**" against Alltru, which is defined in the policy as including "a written demand

for monetary damages or non-monetary relief…" and "a civil proceeding commenced by the

service of a complaint or similar pleading…."  (Ex. A at p.00040.)

In essence, StarNet's position is that, because the FCRA preempted the tort claims asserted

by the class, Alltru became a volunteer when it settled with the class action plaintiffs.  Thus, says

StarNet, Alltru suffered no loss on these claims because the claims were not legally viable, despite the fact that no FCRA claims were ever asserted against Alltru.  StarNet's theory has no support under its own insurance policy.

The definition of "loss" includes "any amount which an insured becomes legally obligated to pay as a result of a claim, including…settlements…."  (Ex. A at p.00021.)  When viewed within the policy's four corners, it is evident that Alltru has suffered a loss as that term is defined in the policy.

*Farmland Indus. v. Republic Ins. Co.,* 941 S.W.2d 505 (Mo. 1997) is instructive to demonstrate the flaws in StarNet's analysis.  In that case, Farmland entered into consent agreements with state and federal agencies to address hazardous substances at various sites. Farmland incurred "environmental response costs" under both state law and the Comprehensive Environmental Response Compensation Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601 – 9675. When its insurers refused to defend or indemnify it, Farmland filed a declaratory judgment action asking the court to declare that the environmental response costs it incurred constituted "damages" under its insurance policy. The insurers countered that equitable relief under CERCLA did not constitute "damages" under the insurance policy.  The trial court granted summary judgment to the insurers, but the Missouri Supreme Court reversed and remanded.

The insurance carriers argued, *inter alia*, that environmental response costs could not be construed as "damages" under the insurance contract because "damages" under CERCLA are confined to "injury to, destruction of, or loss of natural resources…," and the costs Farmland incurred for the "removal or remedial action" are not recognized as "damages" under CERCLA. According to the insurance carrier, the statutory language demonstrated Congressional intent to differentiate between response costs and damages. Because a narrow definition of damages was

20

consistent with the statutory scheme, the insurance carrier argued that Farmland had not suffered any "damages" under its policy, and would therefore have to assume its own liability for response costs.

In rejecting the carriers' position, the court stated: "Respondents incorrectly assume that CERCLA's definition of the term 'damages' governs the interpretation of that term in an insurance policy." *Id.* at 512. The court concluded the insurance policy does "not indicate that the parties plainly intended to give 'damages' a technical meaning." *Id.* at 508. Further, "[t]he policies at issue do not refer to CERCLA for a definition of the term 'damages.'" *Id.* at 512. Therefore, the court applied the ordinary meaning of damages. *Id.* at 512.

Accordingly, the court held that environment response costs incurred under CERCLA and corresponding state laws constituted damages that fell within the definition of Farmland's insurance policies. Under Missouri law, then, statutory definitions are not engrafted into an insurance policy to provide a technical definition of a term unless the insurance policy plainly indicates the intent to use such a technical definition. The policy may not be construed to utilize a statutory definition unless the policy explicitly adopts the statutory language. *See id.* at 508, 512.

StarNet's attempt to apply definitions from the FCRA to this case is clearly contrary to *Farmland Industries*. Unlike *Farmland Industries,* where the claims actually involved CERCLA, the class action plaintiffs did not assert any claims under the FCRA, nor was the FCRA raised as a defense to any of the class action claims. The FCRA was never mentioned.

To prevail on its motion, StarNet needs to prove that it cannot be required to indemnify Alltru as a matter of law. This it cannot do. Alltru suffered an actual loss in this case. StarNet

cannot escape its coverage responsibilities to its insured by advocating definitions that conflict with policy language.

In short, "Insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion." *Krombach v. Mayflower Ins. Co.,* 827 S.W.2d 208, 211 (Mo. 1992), *quoting* Judge Learned Hand's analysis in *Gaunt v. John Hancock Mutual Life Ins. Co.,* 160 F.2d 599, 602 (2d Cir. 1947).

**B.      StarNet is estopped from asserting the Fair Credit Reporting Act as a basis to deny coverage.**

**1.      Insurers must issue a proper reservation of rights.**

Missouri law imposes specific obligations on insurance companies as it relates to reservations of rights. It is the duty of a carrier to assert a *proper* reservation of rights that is timely and clear and that fully informs the insured of its position. "The insurer must conduct an investigation and analysis of the claim with reasonable diligence and must promptly notify the insured of its position once the process is complete. A liability insurer that assumes the defense of its insured should promptly advise the insured of any grounds on which it appears that all or any part of that asserted liability might not be covered. The reservation of rights letter should be specific and unambiguous, should fully explain the insurer's position… with respect to the coverage issue, and must avoid any confusion." *Advantage Building and Exteriors, Inc. v. Mid-Continent Insurance Company* 449 SW 3rd 16 (Mo. App. 2014).  That court went on later to state in order to constitute a "proper" reservation of rights, in addition to being both clear and timely, the insured must fully understand the insurers position. *Supra.*

The failure to issue a proper reservation of rights has consequences. A carrier who undertakes a defense of an action under reservation must inform the insured in its reservation of

rights letter of <u>all</u> policy defenses upon which it may rely to deny coverage.  The failure to do so "will preclude the insurer from later denying liability due to non-coverage." *Id*

The concept is simple. Because an insured has the right to reject a reservation of rights, it is elementary that the insured must be able to make an informed decision in that regard. In order to reach an informed decision, the insured must know all facts and terms of the policy which, according to the carrier, could preclude coverage for the claims asserted.

Under Missouri law, estoppel is almost always a question of fact.  *Savannah Place, Ltd., v. Heidelberg,* 122 S.W. 3d 74 (Mo. App.  2003). "It has been broadly held that estoppel, or the existence thereof, is a question of fact, or that it is ordinarily, usually, or primarily a question of fact, or is for determination by the jury, or ordinarily or generally a jury question, or that it usually presents an issue of fact. When the evidence is conflicting, or where it rests in parole and is not admitted, or where different persons might come to different conclusions from the evidence, the question whether or not estoppel exists is for the jury, or the court sitting as a jury, and the finding of the jury or court is in such case conclusive on appeal." (citing 31 C.J.S. Estoppel § 163 (1964). *Id.* at p. 81.

> **2.     StarNet is estopped from disclaiming coverage based upon the argument that there is no loss or that the Fair Credit Reporting Act preempted the class claims.**

StarNet asserts there is no coverage because Alltru's liability to the class action plaintiffs was preempted by the FCRA. StarNet never informed Alltru of the potential that coverage could be disclaimed on that basis. (Ex. C)

Quite to the contrary, Berkley Finsecure issued a reservation of rights concerning the idea that "certain damages may not be insurable pursuant to the appropriate state law."  (Ex. C at p.3.) But now, StarNet is attempting to rely on federal law, not state law. StarNet is now claiming for

the first time that the underlying tort claims were preempted by federal law, not that they were uninsurable in the first place. *E.g., Brown v. State Farm,* 776 S.W.2d at 387 ("when an insurance company denies liability and states the ground, or grounds, for such denial, it waives all grounds not so specified.").

Likewise, in Bailey Cavalieri's letter of March 31, 2020, StarNet argued that no electronic publishing act was alleged in the underlying suit because the class action plaintiffs had alleged that the pre- and post-sale notices were mailed, not electronically transferred.  (Ex. C at p.11.) However, as Alltru's counsel pointed out in its response of April 6, 2020, the class action plaintiffs also alleged that Alltru reported false and defamatory information on credit reports, and the industry standard for such reporting is by electronic means.  (*Ex.* C at p.13).

StarNet was required to identify, investigate, and disclose to Alltru all bases for its reservation of rights at a time Alltru could make a meaningful determination concerning whether to accept the tender of a defense under the reservation.  *Kinnaman-Carson,* 283 S.W.3d at 765. The timing and content of the reservation are critical because Alltru has been deprived of the opportunity to reject StarNet's defense under those terms, which would have required StarNet to withdraw its reservations, withdraw from defending Alltru altogether, or file its own declaratory judgment action to determine the scope of coverage. StarNet cannot now decline coverage on grounds that it failed to disclose to Alltru in its multiple reservation of rights letters.

## IV.    Conclusion

Counts I, II, or III of Alltru's Complaint state viable causes of action.  StarNet has not met the standards required by FED. R. CIV. P. 12(b)(6) or substantive Missouri law to warrant dismissal. StarNet's attempt to ignore the factual stipulations in the settlement agreement and to inject technical definitions into its policy is not only improper, but has been rejected by Missouri courts.

Beyond that, StarNet is estopped from relying upon defenses not found in their reservations of rights letters.  Alternatively, questions of fact exist on numerous issues as delineated above.

Insurance contracts are to be construed in favor of the insured, and in favor of finding coverage.  StarNet's Motion should be denied in its entirety for all of the reasons set forth herein.

Respectfully submitted,

MARTIN, PRINGLE, OLIVER,
WALLACE & BAUER, L.L.P.


/s/ David E. Larson
David E. Larson, MO #27146
One Main Plaza
4435 Main Street, Suite 920
Kansas City, MO 64111
(816) 753-6006
(816) 502-7898 fax
delarson@martinpringle.com
*Attorney for Plaintiff*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of April, 2022, a copy of the foregoing was filed electronically with the Clerk of the Court, by using the CM/ECF Filing System, with notification to the below listed counsel of record:

Meredith A. Webster
KUTAK ROCK LL
2300 Main Street, Suite 800
Kansas City, MO 64108
(816) 960-0090
(816) 960-0041 (Facsimile)
Meredith.Webster@kutakrock.com
*Attorney for Defendant*


/s/ David E. Larson
David E. Larson, MO #27146