

EXHIBIT
C

July 23, 2019

*Via Email*

Ms. Carol Minges, CIO, CEO
Michelle Rosner, Chief Lending Officer
1st Financial Federal Credit Union

Re:   Insured:      1st Financial Federal Credit Union
      Claim No.:    107 07119
      Policy No:    MLP 6014300-11
      Matter:       <u>Trustee for The Bankruptcy Estate of Jerome Talamante v. 1st
                    Financial Federal Credit Union</u>, filed in the Circuit Court of the City
                    of Missouri

Dear Ms. Minges and Ms. Rosner:

As per our recent conversations, I am the assigned claim representative with regard to the
above-referenced claim and the policy issued by StarNet Insurance Company ("StarNet").
Consequently, all inquiries concerning the coverage position set forth herein should be
directed to my attention.  We are sending you this letter as the authorized representative of
StarNet's insured, 1st Financial Federal Credit Union (hereinafter "1st Financial FCU" or "the
Credit Union") with respect to the above-referenced matter.

The purpose of this letter is to advise you of our coverage position for the claim which is
subject to a reservation of rights as well as explain the grounds which may limit, negate or
otherwise affect coverage for the matter pursuant to the terms, provisions and exclusions
included within the policy.

<u>**The Lawsuit:**</u>

Plaintiff Stuart Radloff, who is the bankruptcy trustee for the Jerome Talamante bankruptcy,
filed the above-referenced "consumer class action" on July 3, 2019.  It appears that the
Credit Union was served on July 15, 2019.

With regard to borrower Talamante, the lawsuit concerns two Contracts and Security
Agreements to purchase a boat as well as a 2009 Cadillac CTS; both of which were
repossessed by the Credit Union.  It is alleged that pre-sale and post-sale notifications did
not comply with the Uniform Commercial Code ("the UCC").  It is averred that the pre-sale
notifications failed to adequately describe the deficiency balance.  Likewise, the Complaint
alleges that the post-sale notices did not include information regarding interest, rebates and
expenses that could impact the amount of the surplus or deficiency.  The lawsuit further
alleges that 1st Financial FCU has "unlawfully" attempted to collect the deficiency balances.
In addition, it is alleged that the incorrect deficiency balances have been reported to credit
reporting agencies.

The purported class consists of those individuals who entered into a loan of financing agreement with the Credit Union and had their vehicles repossessed and sold.  There is an alternative class consisting of those people who did not receive pre-sale notification or the notification included the phrase "will or will not, as applicable."  The Complaint includes one count pursuant to the UCC and seeks damages pursuant thereto.

### *The Policy:*

StarNet issued a Management Liability Insurance Policy (the "Policy"), Policy Number MLP 6014300-11 to 1st Financial Federal Credit Union.  The policy is effective from November 28, 2016 through November 28, 2019.  Coverage under the Policy includes Company Lender Liability, Insuring Agreement E, which carries a $250,000 Policy Year Limit of Liability, subject to a $10,000 Retention Per Loss.

### *Coverage Analysis:*

Insuring Agreement E, as provided in the Credit Union Amendatory Endorsement provides that StarNet "shall pay on behalf of the company, loss which the company becomes legally obligated to pay as a result of any claim first made it, during the policy period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, for a lending act taking place after the retroactive date, if any."

The following definitions are set forth in the StarNet policy:

> U. Lending act, means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a director, officer, employee or the company, in connection with or relating to:
> a. an agreement to or refusal to grant or extend a loan, lease or extension of credit;
> b. the granting or extending of a loan, lease or extension of credit;
> c. loan servicing, including the servicing of loans for others under a contract or agreement; or
> …
>
> UU.      Wrongful act means management practices act, professional and depository services act, securities act, electronic banking act, electronic publishing act, employment practices act, fiduciary act, IRA/Keogh/Health Savings Account act, lending act….

The term "Claim" is defined in an amendatory endorsement and includes the following language: "[c]laim means the following, including any appeal therefrom: a. a written demand for monetary damages or non-monetary relief [or a] a civil proceeding commenced by the service of a complaint or similar pleading. . . ."

Here, the above-discussed Complaint filed against the Credit Union appears to constitute a claim arising from lending act.  Plaintiff alleges that the Credit Union's sale notifications were not compliant with the UCC; such allegations concern debt collection practices (loan servicing).  StarNet's rights with respect to whether Insuring Agreement E is triggered are fully reserved.

The Policy provides the following definition of "Loss" –

> V. Loss means any amount which an insured becomes legally obligated to pay as a result of a claim, including punitive, exemplary or multiple damages in excess of actual damages (except where uninsurable by law), judgments, settlements, pre-judgment and post-judgment interest, and reasonable defense expenses; however loss does not include:
> a. any unrepaid, unrecoverable or outstanding loan, lease or extension of credit;
> b. any costs incurred to comply with any injunctive or nonmonetary relief or any agreement to provide such relief; or
> c. matters uninsurable under the law pursuant to which this policy is construed.
>
> Where an insured reasonably determines that punitive, exemplary or multiple damages are insurable under the applicable law, the Insurer shall not challenge that interpretation of insurability.

StarNet is reserving its rights with respect to the above-quoted definition of Loss.  For instance, certain damages may not be insurable pursuant to the appropriate state law. Likewise, damages amounting to loan proceeds are excluded from the definition of Loss.

StarNet is reserving its rights with respect to two exclusions set forth in the Credit Union Amendatory Endorsement which bar coverage for loss that in connection with a claim that is –

> F. for any fraudulent, dishonest or criminal actions of an insured or for any deliberate or willful omission of, violation of or noncompliance with any statute or regulation by an insured. However, an insured shall be indemnified for defense expenses as to any claim alleging such fraudulent, dishonest or criminal actions or deliberate omission or willful violation of or noncompliance with any statute or regulation, until a final judgment, final determination or final adjudication, which would not be deemed to have occurred until any actual appeals have been exhausted, establishes such fraudulent, dishonest or criminal actions or deliberate omission or willful violation of or noncompliance with any statute or regulation. In the event such fraudulent, dishonest or criminal actions or deliberate omission or willful violation of or noncompliance with any statute or regulation are established, the appropriate insured agrees to repay the Insurer, upon demand, all monies advanced by the Insurer in connection with such claim. . . .
> J. for any insured gaining in fact any personal profit, remuneration or financial advantage to which such insured was not legally entitled. However, an insured shall be indemnified for defense expenses as to any claim alleging such personal profit, remuneration or financial advantage, until a final judgment, final determination or final adjudication, which would not be deemed to have occurred until any actual appeals have been exhausted, establishes such personal profit, remuneration or financial advantage. In the event such personal profit, remuneration or financial advantage is

3

established, the appropriate insured agrees to repay the Insurer, upon demand, all monies advanced by the Insurer in connection with such claim. . ..

To the extent that Exclusions F and J are applicable to the above-discussed claim, StarNet's rights are fully reserved.

### *Defense Issues:*

Please note Section 4.  General Terms, Conditions and Limitations which includes the following policy provisions:

> Defense and Settlement
> The insureds agree not to settle or offer to settle any claim, incur any defense expenses or otherwise assume any contractual obligation, admit any liability, voluntarily make any payment or confess or otherwise agree to any damages or judgments with respect to any claim covered by this policy without the Insurer's written consent, which shall not be unreasonably withheld.  The Insurer shall not be liable for any settlement, defense expenses, assumed obligation, admitted liability, voluntary payment, or confessed or agreed damages or judgment to which it has not consented in writing.
>
> The Insurer shall be entitled to full cooperation and all information and particulars it may reasonably request from the insureds in order to conduct its investigation or to reach a settlement of the claim.  The insureds agree that in the event of a claim, the insureds will do nothing that may prejudice the Insurer's position or its potential or actual rights of recovery.

With regard to the above-quoted policy language, in the event that there are discussions regarding possible settlement, StarNet should be included in such negotiations.  The StarNet policy includes the following provision regarding retaining defense counsel, as per the Amend Duty of the Insureds to Defend Endorsement:

> It shall be the duty of the insureds to select defense counsel, which shall be subject to the approval of the Insurer (such approval shall not be unreasonably withheld), and to defend any claim covered under this policy except for claims covered under the Employment Practices Liability Insuring Agreement.
>
> With respect to any claim submitted for coverage, the Insurer shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the insureds regarding: (a) the selection of appropriate defense counsel; (b) substantive defense strategies, including decisions regarding the filing and content of substantive motions; and (c) settlement negotiations.

Pursuant to the above-quoted provision, as has been discussed, it is the Credit Union's right and obligation to retain defense counsel.  My understanding is that you are in the process of possibly retaining Tom Martin of Lewis Rice to defend this matter.  Please confirm that Mr. Martin has been retained when you have an opportunity.

The policy provides that "the Insurer's liability with respect to loss arising from each claim shall apply only to that part of loss which is excess of the applicable retention shown in the Declarations, and such retention shall be borne by the company uninsured and at its own risk."  Pursuant to the above-quoted language, the Credit Union is responsible for all loss, including defense expenses (attorney's fees), up to the $10,000 retention.

The Policy provides the following language with regard to the available limit:

> The Insurer's maximum liability for loss under an insuring agreement as a result of all claims first made during the same policy year, including the Automatic Reporting Period or, if exercised, the Extended Reporting Period, shall be the respective amount shown in the Declarations as the Policy Year Limit of Liability for that insuring agreement.

> Defense expenses shall be a part of, and not in addition to, the insuring agreement's Policy Year Limit of Liability, and defense expenses shall reduce and may exhaust such limit of liability.

With respect to the above-referenced language, defense costs that are paid by StarNet (in excess of the $10,000 retention) reduce the available limit under the Insuring Agreement, $250,000.

The Complaint avers that damages may concern the "harm" caused by "defamation" and/or "invasion of privacy."  *See* Complaint at ¶ 67.  Such allegations may render coverage under a general liability policy applicable.  Accordingly, you should ensure that the general liability insurer is placed on notice of this matter.

### *Conclusion:*

StarNet Insurance Company reserves all of its rights under the Policy, at law and in equity. The failure of StarNet to include any terms, conditions or exclusions of the Policy in this Reservation of Rights letter shall not waive any current or future rights or defenses of StarNet pursuant to the Policy, or to act to prevent StarNet from asserting such rights or defenses. Furthermore, should there be any policy or term quotations in this letter which may differ from the actual policy, please be advised that the terms, provisions and conditions of the actual policy will govern.  I reiterate that this letter does not pertain to the financial institution bond.

Thank you for your attention to this matter. Please feel free to contact me with any questions or concerns.

Very truly yours,

Kurt C. Schultheis
Senior Management Liability and Bond Claim Specialist
410-372-6318
kschultheis@berkleyfinsecure.com

5

cc:      bondclaims@alliedsolutions.net

**6**

# BAILEY | CAVALIERI

**THOMAS E. GEYER**
E tgeyer@baileycav.com
D 614.229.3206

March 31, 2020

**VIA E-MAIL (delarson@martinpringle.com)**

David E. Larson
Martin Pringle Attorneys at Law
One Main Plaza
4435 Main Street, Suite 920
Kansas City, MO 64111

|     |           |                                           |
|-----|-----------|-------------------------------------------|
| Re: | Insurer:  | StarNet Insurance Company                 |
|     | Insured:  | 1st Financial Federal Credit Union        |
|     | Policy No.: | MLP 6014300-11                          |
|     | Matter:   | Stuart Radloff, et al.                    |
|     | Claim No.: | 107 07119                                |

Dear Mr. Larson:

We have been retained by StarNet Insurance Company ("StarNet") to represent its interests in connection with the above-referenced matter.  On behalf of StarNet, we are in receipt of your March 10, 2020 letter to Kurt Schultheis regarding coverage for the lawsuit captioned *Stuart Radloff, et al. v. 1st Financial Federal Credit Union*, Case No. 1922-CC10792, Circuit Court of the City of St. Louis, State of Missouri (the "Lawsuit") under Management Liability Insurance Policy No. MLP 6014300-11 (the "Policy") and attaching a copy of a February 11, 2020 letter issued by Jesse Rochman of The Onder Law Firm, plaintiff's counsel in the Lawsuit, to Tom Martin of Lewis Rice LLC, defense counsel in the Lawsuit, purporting to make a settlement demand of $9,750,000.  In addition, on behalf of StarNet, we are in receipt of your March 20, 2020 email to Mr. Schultheis, attaching a copy of the First Amended Petition filed in the Lawsuit.

We are directing this letter to you as the authorized representative of 1st Financial Federal Credit Union ("1st Financial" or the "Company") under the Policy.  If you are not acting on behalf of 1st Financial for insurance coverage purposes, please forward a copy of this letter to its authorized insurance representative and let us know with whom we should communicate regarding this matter.

A.    The Lawsuit

The Lawsuit is a purported consumer class action filed on or about July 3, 2019 by Stuart Radloff, as trustee for the bankruptcy estate of Jerome Talamante, and George Ochoa. It appears

Bailey Cavalieri LLC • 10 West Broad Street • Suite 2100 • Columbus, Ohio 43215-3422
P 614.221.3155   F 614.221.0479   W baileycav.com
ATTORNEYS AT LAW

7

David E. Larson
March 31, 2020
Page 2

that 1st Financial was served with the Original Petition on July 15, 2019.  Plaintiffs filed the First Amended Petition on or about March 6, 2020.  Plaintiffs allege that they, and each putative class member, signed a consumer credit contract for the purchase of a motor vehicle and appear to have obtained loans for the purchase of such motor vehicles from 1st Financial, the collateral for which was the motor vehicles.

Plaintiffs generally allege that 1st Financial engaged in an unlawful and deceptive pattern of wrongdoing with respect to its collection, enforcement, repossession, and disposition of collateral, and collection of alleged deficiencies.  As part of the alleged pattern of wrongdoing, 1st Financial reportedly mailed Plaintiffs and other consumers a presale notice that allegedly violated the Uniform Commercial Code ("UCC") and restricted Plaintiffs' right to redemption of their property, including a redemption policy requiring consumers to: (a) redeem by certified funds and (b) prove they have sufficient income or budget to afford loan payments after redemption.

More specifically, the mailed pre-sale notifications allegedly failed to adequately describe the deficiency balance, and the mailed post-sale notices allegedly did not include information regarding interest, rebates and expenses that could impact the amount of the surplus or deficiency.  Plaintiffs further allege that 1st Financial "unlawfully" attempted to collect the deficiency balances and that the incorrect deficiency balances were reported to credit reporting agencies.  Plaintiffs contend the foregoing constitutes oral or written publication of material that defames, slanders or libels the putative class members and that invaded the putative class's privacy rights.

The additional allegations set forth in the First Amended Petition generally include that the alleged acts of 1st Financial consisted of negligent misrepresentations and were not done with the intent to injure or with knowledge of falsity, and did not require professional skill or specialized knowledge.

Based on the foregoing, the First Amended Petition sets forth a single cause of action asserting that 1st Financial violated the UCC by failing to provide the presale notice in the form and manner required under the UCC before disposing of collateral secured by loans entered by, assigned to, or owned by 1st Financial.  Plaintiffs seek actual damages, statutory damages, pre- and post-judgment interest, and injunctive and declaratory relief.

B.    The Policy

StarNet issued the Policy to 1st Financial for the Policy Period from November 28, 2016 through November 28, 2019. Coverage under the Policy includes, among other coverages, (1) Company Lender Liability, Insuring Agreement E, which carries a $250,000 Policy Year Limit of Liability, subject to a $10,000 Retention per Loss; (2) Third Party Harassment Liability, Insuring Agreement I, which carries a $1,000,000 Policy Year Limit of Liability, subject to a $10,000 Retention per Loss; and (3) Electronic Publishing Liability, Insuring Agreement K,



David E. Larson
March 31, 2020
Page 3

which carries a $2,000,000 Policy Year Limit of Liability, subject to a $25,000 Retention per Loss.

Insuring Agreement E, as amended by the Credit Union Amendatory Endorsement, provides that StarNet shall pay on behalf of the Company, Loss which the Company becomes legally obligated to pay as a result of any Claim first made it, during the Policy Period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, for a Lending Act taking place after the retroactive date, if any.

Insuring Agreement I provides that StarNet shall pay on behalf of the Directors, Officers, Employees and the Company, Loss which the Directors, Officers, Employees or the Company become legally obligated to pay as a result of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, for a Third Party Harassment Act taking place after the Retroactive Date, if any.

Insuring Agreement K provides that StarNet shall pay on behalf of the Directors, Officers, Employees and the Company, Loss which the Directors, Officers, Employees or the Company become legally obligated to pay as a result of any Claim first made against them, individually or otherwise, during the Policy Period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, for an Electronic Publishing Act taking place after the Retroactive Date, if any.

C.     Coverage Discussion

StarNet believes it is prudent to identify for you at this time the actual and potential coverage defenses applicable to the Lawsuit that are now known to StarNet.  StarNet recognizes that the allegations set forth in the Original Petition and the First Amended Petition have not been proven, and the following discussion should not be interpreted as suggesting that any of the allegations have any legal or factual merit.

1.     The Original Petition and the First Amended Petition Constitute a Single Claim.

Section 2.C. of the Policy provides, in the relevant part, that all Claims involving Interrelated Wrongful Acts shall be considered a single Claim and shall be deemed to have been first made when the earliest Claim was first made.  Section 2.S. of the Policy defines the term Interrelated Wrongful Acts as Wrongful Acts[1] that have as a common nexus any fact,

---

[1] Section 2.UU. defines the term Wrongful Act to mean Management Practices Act, Professional and Depository Services Act, Securities Act, Electronic Banking Act, Electronic Publishing Act, Employment Practices Act, Fiduciary Act, IRA/Keogh/Health Savings Account Act, Lending Act, Third-Party Harassment Act, Security Breach and Trust Act, but only to the extent that coverage is granted for such acts pursuant to the purchase of an insuring agreement under this policy.



David E. Larson
March 31, 2020
Page 4

circumstance, situation, event, transaction or series of facts, circumstances, situations events, or transactions.

The core alleged wrongdoing by 1st Financial in the Original Petition and the First Amended Petition are substantially (if not exactly) the same. That is, Plaintiffs in each instance allege that 1st Financial engaged in an unlawful and deceptive pattern of wrongdoing with respect to its collection, enforcement, repossession, and disposition of collateral on the loans for motor vehicles obtained by Plaintiffs from 1st Financial, and collection of alleged deficiencies, allegedly in violation of the UCC. As noted above, the only additional allegations set forth in the First Amended Petition appear to be that the alleged acts of 1st Financial consisted of negligent misrepresentations and were not done with the intent to injure or with knowledge of falsity, and did not require professional skill or specialized knowledge.

Therefore, the Original Petition and the First Amended Petition involve the same Wrongful Acts and Interrelated Wrongful Acts such that they shall be considered a single Claim and shall be deemed to have been first made when the Original Petition was first made (i.e., on July 15, 2019 when the Original Petition was served on 1st Financial). Accordingly, the coverage issues and defenses set forth in Mr. Schultheis's July 23, 2019 letter with respect to the Original Petition are expressly adopted and incorporated herein as equally applicable to the First Amended Petition.

2.      No Coverage Is Available for the Lawsuit under Insuring Agreement I of the Policy.

As set forth above, Insuring Agreement I generally provides coverage for a Third Party Harassment Act. Section 2.RR. of the Policy defines the term Third Party Harassment Act as any actual or alleged: (a) violation of any federal, state, provincial or local statutory law, common law or civil law prohibiting discrimination of any kind; (b) harassment, including any type of sexual, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment; (c) defamation, libel, slander, disparagement or invasion of privacy; (d) false arrest, false imprisonment or malicious prosecution; or (e) bullying of a natural person other than an Employee, Officer or Director *and other than as a part of a Lending Act* (emphasis added).

Section 2.U. of the Policy defines the term Lending Act as any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a Director, Officer, Employee or the Company, in connection with or relating to: (a) an agreement to or refusal to grant or extend a loan, lease or extension of credit; (b) the granting or extending of a loan, lease or extension of credit; (c) loan servicing, including the servicing of loans for others under a contract or agreement; or (d) the restructure, termination, transfer, repossession or foreclosure of a loan, lease or extension of credit.

While Plaintiffs allege oral or written publication by 1st Financial of material that defames, slanders or libels the putative class members, that alleged conduct is part of a Lending



David E. Larson
March 31, 2020
Page 5

Act, such that the carveout in Insuring Agreement I applies.  That is, the allegedly defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports were, according to Plaintiffs, oral or written publication of material that defames, slanders or libels the class members.

The alleged actions of sending presale and post-sale notices and reporting of false derogatory information on the class members' credit reports fall squarely within subsection (d) of the definition of Lending Act because those alleged actions constitute an alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a Director, Officer, Employee or the Company, in connection with or relating to the repossession of a loan, lease or extension of credit.  In other words, but for 1st Financial allegedly sending deficient presale and post-sale notices and reporting of false derogatory information on the class members' credit reports as part of its repossession or foreclosure of a loan, lease or extension of credit, Plaintiffs would have no defamatory-related claims.  As such, any Third Party Harassment Act alleged by Plaintiffs is part of a Lending Act, such that Insuring Agreement I does not apply.  Accordingly, no coverage is available for the Lawsuit under Insuring Agreement I.[2]

> 3.   No Coverage Is Available for the Lawsuit under Insuring Agreement K of the Policy.

As set forth above, Insuring Agreement K generally provides coverage or an Electronic Publishing Act.  Section 2.J. of the Policy defines the term Electronic Publishing Act as any actual or alleged: (a) libel or slander resulting from the electronic publishing of material that defames a person or organization or disparages the goods, products or services of a person or organization; (b) plagiarism, false light or false advertising, resulting from electronic publishing activities; (c) violation of the right of privacy or right of publicity of any person or organization by the electronic publishing of material that publicly discloses private facts or commercially appropriates the name or likeness of such person or organization; (d) infringement of a copyright, title, trademark, trade dress, trade name, service mark, service name or slogan via electronic publishing activities; or (e) unauthorized use of titles, formats, performances, style, characters, plots or other protected material via electronic publishing activities.

Insuring Agreement K does not apply to the Lawsuit because no Electronic Publishing Act is alleged in the Lawsuit.  Although Plaintiffs contend that allegedly defective presale and post-sale notices and the reporting of false or inaccurate derogatory information on the class members' credit reports constitute oral or written publication of material that defames, slanders or libels the class members, Plaintiffs allege throughout the Original Petition and First Amended Petition that the presale and post-sale notices were *mailed*.  Moreover, there is no allegation or indication that 1st Financial's supposed "reporting of false or inaccurate derogatory information

---

[2] Consistent with the comment in Mr. Schultheis' July 23, 2019 letter, the Company may wish to ensure that its general liability insurer is placed on notice of this matter.



David E. Larson
March 31, 2020
Page 6

on the class members' credit reports" involved electronic publishing.  Accordingly, no coverage
is available for the Lawsuit under Insuring Agreement K.

D.     Reservation of Rights

In addition to the disclaimers, reservations, and defenses set forth above and in StarNet's
prior correspondence, StarNet expressly reserves all of its rights and defenses under the Policy to
modify its coverage positions based on any of the Policy terms, conditions, exclusions, or
defenses set forth above or based on any other Policy term, condition, exclusion or defense that
may be applicable as additional facts come to StarNet's attention.   Nothing herein shall be
construed as a waiver of any rights or defenses that StarNet now has or hereafter may have under
the Policy or at law.  StarNet recognizes that the Insured is similarly reserving rights.

Sincerely,

BAILEY CAVALIERI LLC

Thomas E. Geyer

cc:    Kurt Schultheis (kschultheis@berkleyfinsecure.com)
       Jordan Watrous (jwatrous@baileycav.com)

#1781885
13451.19978

**BAILEY | CAVALIERI**

12



One Main Plaza, 4435 Main Street, Suite 920, Kansas City, Missouri 64111 | 816-753-6006

**DAVID E. LARSON** | **delarson@martinpringle.com**

April 6, 2020

Thomas E. Geyer, Esq.

Re:   Insurer:       StarNet Insurance Company
      Insured:       1st Financial Federal Credit Union
      Policy No.:    MLP 6014300-11
      Matter:        Stuart Radloff, et al.
      Claim No.:     107 07119

Dear Mr. Geyer:

We are in receipt of and thank you for your letter of March 31, 2020.  We respectfully disagree with your coverage analysis, and with the understanding that the following discussion should not be construed as an exhaustive statement of 1ˢᵗ Financial's position on coverage, please see below.

### *Coverage I – Third Party Harassment*

We take issue with your position on Insuring Agreement I.  You have incorrectly expanded the definition of Third-party harassment act by using the phrase "*and other than as a part of a Lending Act"* as a modifier of subparts a-d of the definition.  For your interpretation to be correct, there would need to be a semicolon either after the word "bullying" or "director". As an example, we refer you to the following definition of the word "Plan" as contained in the policy:

CC.  Plan means:
a. any employee benefit plan (as defined by ERISA) which is operated solely by the company, or jointly by the company and a labor organization, for the benefit of the employees or officers, if such plan existed before the policy period or is afforded coverage pursuant to the Changes in Exposure section;
b. any other employee benefit plan not subject to Title 1 of ERISA sponsored solely by the company for the benefit of the employees or officers, if such plan existed before the policy period or is afforded coverage pursuant to the Changes in Exposure section;
c. any other employee benefit plan if listed as a plan in an endorsement to this policy;
d. any other plan or program described in (a) or (b) above while such plan or program is actively being developed, formed or proposed by the company prior to the formal creation of such plan or program; or

Thomas E. Geyer, Esq.
April 6, 2020
Page 2

> e. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefits for employees or officers; provided that plan shall not include any multi-employer plan or employee stock ownership plan unless such plan is specifically listed as a plan in an endorsement to this policy.

By use of the semicolon following subpart e, it was clear that StarNet's intent that the limiting language following the semicolon applied to all five subparts.

In Missouri, punctuation is important in the interpretation of insurance policies. For example, we refer you to the case of *Dry v. United Fire & Cas. Co.*, 420 S.W.3d 593 (Mo. Ct. App. 2013). This was an equitable garnishment case in which the outcome was determined by how the term "volunteer worker" was defined in the policy. The policy defined a "volunteer worker" as "a person who is not your "employee", [sic] who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you."

The court of appeals recited the well-established rules of construction of insurance policies: "In construing the terms of an insurance policy, this Court uses an objective standard, applying the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Burns v. Smith,* 303 S.W.3d 505, 511 (Mo. banc 2010). We apply the general rules of contract interpretation, and "[t]he key is whether the contract language is ambiguous or unambiguous." *Todd v. Missouri United School Ins. Council,* 223 S.W.3d 156, 160 (Mo. banc 2007) (quoting *Peters v. Employers Mut. Cas. Co.,* 853 S.W.2d 300, 302 (Mo. banc 1993)). "Language is ambiguous if it is reasonably open to different constructions." *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690 (Mo. banc 2009) (quoting *Seeck v. Geico General Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007)). "Absent an ambiguity, an insurance policy must be enforced according to its terms." *Jones,* 287 S.W.3d at 690. "A court is not permitted to create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate." *Strader,* 230 S.W.3d at 624 (quoting *Rodriguez v. General Acc. Ins. Co. of America,* 808 S.W.2d 379, 382 (Mo. banc 1991))."

The trial court had concluded that the individual who caused the loss was not a "volunteer worker" because his involvement was not directed "by you[.]" "You" was a defined term in the policy with a narrow meaning: it referred to the named insured which was Wingo Masonry. Dry, however, argues that the last portion of the definition of "volunteer worker" expands the scope of who may provide direction to a "volunteer worker." The last portion of the definition of "volunteer worker" provided the worker may not be paid "by you or anyone else[.]"

On appeal, the plaintiff asserted that the trial court's interpretation of the definition was incorrect because the phrase or "anyone else" would be rendered meaningless. The Court of Appeals rejected that argument stating: "The portion of the definition discussing the scope of the worker's duties is modified by the phrase "by you" while the portion of the definition discussing payment of the worker is modified by the phrase "by you or anyone else for their work performed for you." The two requirements are separated by a comma and a conjunction. This structure

Thomas E. Geyer, Esq.
April 6, 2020
Page 3

suggests the two requirements are separate and the modifying phrases apply only to the requirement to which they are closest: the phrase "by you" applies to the phrase describing the direction of a volunteer worker and the phrase "by you or anyone else" applies to the phrase describing the payment of a volunteer worker." *Id at p. 597.*

The same argument applies here.  The absence of a semicolon following either "bullying" or "director" means that the modifying phrase "and other than as part of a lending act" applies only to the requirement to which it is closest.  At best, the definition is ambiguous.  This is true particularly because of the manner in which punctuation, including semicolons, is used elsewhere in policy. To this point, we refer you to *John Drennon & Sons Co. v. New Hampshire Ins. Co.*, 637 S.W.2d 339 (Mo. Ct. App. 1982), which states:

While punctuation may not be controlling, we believe it is to be considered. The best we can say for defendant's contention is that this provision of the policy might be ambiguous. If so, we would construe it in favor of plaintiff. Under either approach the plaintiff's interpretation would prevail. *Id.*  at p. 341 (internal citations omitted).

Based on this authority, it would be unreasonable to take the position that a Missouri court would view the modifier "of a natural person other than an employee, officer or director and other than as a part of a lending act" as applying to anything other than subpart e., bullying. Thus, coverage is clearly available under Coverage I.

***Coverage K – Electronic Publishing Act***

StarNet's position with respect to Coverage K is problematic as well.  The mistake appears to result from an incomplete analysis of plaintiff's claims.

StarNet apparently seized upon the allegation in Plaintiff's class complaint that incorrect pre-sale and post-sale notices were *mailed* to the class plaintiffs.  While that statement is correct, it only touches on a portion of the claims made by the class plaintiffs.  Indeed, it ignores the portion of the class complaint directed toward the reporting of incorrect collection activity and credit information by 1st Financial to the various credit agencies, thereby causing the incorrect information to be reported by the credit agencies to their subscribers.  In each instance, the incorrect information was published electronically.

The following are excerpts from the amended petition:

29. The defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports harmed the class members' credit worthiness, credit standing, credit capacity, character, and general reputation.

30. The defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports were oral or written publication of material that defames, slanders or libels the class members.

Thomas E. Geyer, Esq.
April 6, 2020
Page 4

31. The defective presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports were oral or written publication of material that invaded the Class's privacy rights.

83. As a direct and proximate result of failure to comply with the requirements of Subchapter 6 of Article 9 of the UCC, Plaintiffs and the Class suffered actual damages not less than the minimum damages provided by §400.9-625(c)(2), including:

c. harm to credit worthiness, credit standing, credit capacity, character, and  general reputation;
d. harm caused by defamation, slander and libel;
e. harm caused by invasion of privacy;

WHEREFORE, Plaintiffs pray this Court Plaintiffs and the Class against Credit Union:

f. a mandatory injunction compelling Credit Union to remove any adverse credit information wrongfully reported on Plaintiffs' and the Class's consumer credit reports…

Your argument hinges upon the absence of a specific allegation that the reporting of false for inaccurate derogatory information on the class members' credit reports involves electronic publishing.  Yet, the fact that credit reporting agencies publish credit information electronically—not by *mail*—is so well known that StarNet would have to bury its head in the sand to escape that reality.  Clearly, abandoning common sense to avoid coverage under an insurance policy is not supported under Missouri law.  Nor is taking an unreasonably narrow or restricted investigation of the claims alleged in evaluating coverage.  *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 969 (8th Cir. 1999) (citing *McCormack Baron Mgt. v. American Guarantee*, 989 S.W.2d 168, 170-171 (Mo. banc 1999)) (coverage "is normally determined by comparing the policy language with the allegations in the complaint.  But the insurer may not ignore 'actual facts,' that is, 'facts which were known, or should have been reasonably apparent ….'").

It is clear, as you tacitly acknowledge, that if such false or defamatory reports were electronically conveyed to credit agencies, coverage would be afforded under Coverage K.  What you are overlooking, however, is that electronic transmission of credit information by lending institutions is not only commonplace but is standard in the industry. 1ˢᵗ Financial electronically transmits credit information about its members to credit reporting agencies which results in the same information being reported electronically by the credit agencies to their customers.  This is a fact that, even if not specifically alleged, is well known and will be conclusively and inescapably established in this lawsuit.  As stated by the Missouri Supreme Court in *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. 1999), "[T]he duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement."

Thomas E. Geyer, Esq.
April 6, 2020
Page 5


The result is that coverage is or will be afforded under Coverage K, resulting in a Policy Year Limit of $2,000,000 rather than the $250,000 limit claimed in your letter.

With Kind Regards,

MARTIN, PRINGLE, OLIVER,
    WALLACE & BAUER, L.L.P.


By: /s/ David E. Larson

By: /s/ W. Rick Griffin

**BAILEY | CAVALIERI**

**THOMAS E. GEYER**
E tgeyer@baileycav.com
D 614.229.3206

April 17, 2020

**VIA E-MAIL (delarson@martinpringle.com)**

David E. Larson
Martin Pringle Attorneys at Law
One Main Plaza
4435 Main Street, Suite 920
Kansas City, MO 64111

|  | | |
|---|---|---|
| Re: | Insurer: | StarNet Insurance Company |
|  | Insured: | 1st Financial Federal Credit Union |
|  | Policy No.: | MLP 6014300-11 |
|  | Matter: | Stuart Radloff, et al. |
|  | Claim No.: | 107 07119 |

Dear Mr. Larson:

On behalf of StarNet Insurance Company ("StarNet"), we are in receipt of your April 6, 2020 letter in response to our March 31, 2020 letter regarding coverage for the lawsuit captioned *Stuart Radloff, et al. v. 1st Financial Federal Credit Union*, Case No. 1922-CC10792, Circuit Court of the City of St. Louis, State of Missouri (the "Lawsuit") under Management Liability Insurance Policy No. MLP 6014300-11 (the "Policy").[1]

While StarNet has carefully considered the points raised in your April 6th letter, for the reasons set forth in our March 31st letter and as further discussed below, StarNet respectfully maintains that no coverage is available for the Lawsuit under either Insuring Agreement I or Insuring Agreement K.  The following addresses the primary points raised in your April 6th letter, in turn:

A.    No Coverage Is Available for the Lawsuit under Insuring Agreement I of the Policy.

Your characterization of the definition of "Third Party Harassment Act," and contention that Insuring Agreement I affords coverage for the Lawsuit, are simply incorrect.

---

[1] We are directing this letter to you as the authorized representative of 1st Financial Federal Credit Union ("1st Financial" or the "Company") under the Policy.  If you are no longer acting on behalf of 1st Financial for insurance coverage purposes, please forward a copy of this letter to its authorized insurance representative and let us know with whom we should communicate regarding this matter.

Bailey Cavalieri LLC  •  10 West Broad Street  •  Suite 2100  •  Columbus, Ohio 43215-3422
P 614.221.3155   F 614.221.0479   W baileycav.com
ATTORNEYS AT LAW

David E. Lawson
April 17, 2020
Page 2

In our March 31st correspondence, we did not transcribe the definition of the term "Third Party Harassment Act" in the exact format that it is presented in the Policy.  However, we now do so below, in order to dispel your inventive argument that this insuring agreement is applicable to the Lawsuit, and that the placement of a semicolon before or within the last clause of the provision is needed in order for StarNet's position to be correct.[2]

Section 2.RR. of the Policy states that:

Third Party Harassment Act means any actual or alleged:
a.  violation of any federal, state, provincial or local statutory law, common law or civil law prohibiting discrimination of any kind;
b.  harassment, including any type of sexual, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment;
c.  defamation, libel, slander, disparagement or invasion of privacy;
d.  false arrest, false imprisonment or malicious prosecution; or
e.  bullying of a natural person other than an Employee, Officer or Director and other than as a part of a Lending Act.

Importantly, the placement of the last phrase that begins "of a natural person" on a new line that is justified farther to the left than the text of the lettered subsections makes clear that that phrase applies to all of the preceding subsections, not just the term "bullying" in subsection e. (as you assert).  Your reading of the provision applying the phrase "of a natural person other than an Employee, Officer or Director and other than as part of a Lending Act" only to the term bullying is strained and inaccurate, not to mention grammatically distinct from the example definition you provide in your letter.

To that end, if your reading of the definition of Third Party Harassment Act was correct, Insuring Agreement I would afford coverage for the harassment, as set forth in subsections a. through d., *of* an Employee, Officer or Director.  Not only is such an outcome inconsistent with the "third party" nature of the definition and Insuring Agreement I, it would result in substantial overlap with the Employment Practices Liability insurance set out in Insuring Agreement H.

Further, under your proposed interpretation the Third Party Harassment Liability insuring agreement would afford coverage for loss incurred by an employee for harassment of that employee by another employee.  Your reading, therefore, cannot be correct because such harassment would not be "third party harassment" since harassment of any employee by another employee is not, under its plain meaning, harassment by a *third party* (i.e., an "outsider").  As

---

[2] Terms capitalized but not otherwise defined in this letter have the meanings assigned to them in the Policy.



David E. Lawson
April 17, 2020
Page 3

such, that proposed interpretation is not what would be attached by an ordinary person of average understanding.

Your alternative argument that a semicolon is supposedly necessary after the term "Director" entirely ignores the placement of the "of a natural person" phrase on a new line that is justified farther to the left than the text of the lettered subsections.  If the "of a natural person" phrase, in whole or in part, was meant to apply only to the term bullying, it would not be on a new line, separated from the term bullying, and justified to the left.  The example you provide in your April 6th letter of the definition of the term "Plan" in the Policy is inapt.  A basic tenet of grammar is that a semicolon is used to separate independent clauses or sentences.   In the definition of the term Plan in the Policy, there is necessarily a semicolon before the word "provided" because the word "provided" starts a new, independent sentence.

To be sure, the clause "Plan should not include any multi-employer plan or employee stock ownership plan unless such plan is specifically listed as a Plan in an endorsement to this policy" is an independent sentence.  Conversely, the phrase in the definition of Third Party Harassment Act "of a natural person other than an Employee, Officer or Director and other than as a part of a Lending Act" is not an independent sentence and therefore does not need to be separated by a semicolon.  Several other definitions in the Policy are consistent with this grammatically correct formatting.  *See, e.g.,* Section 2.L. (definition of Employment Practices Act) and Section 2.SS. (definition of a Trust Act).  Indeed, the very purpose of the "other than" clause in the definition of Third Party Harassment Act is to make clear that acts intended to be covered by one insuring agreement (here, the Company Lender Liability Insuring Agreement) are not duplicatively covered by another insuring agreement.

Moreover, the propositions of law in the cases you rely upon in your letter do not support your contention that a semicolon is necessary or that any ambiguity exists here.

First, the *Dry* case you rely upon is inapposite.  As you describe in your letter, that case involved a definition of a term in an insurance policy that was not made up of various lettered subparts and did not contain (or supposedly have any missing) semicolons, but rather was a single sentence with two distinct portions or clauses that contained different modifying language.  That is, the *Dry* court determined that the portion of the definition at issue discussing the scope of the worker's duties was modified by the phrase "by you," while the portion of the definition discussing payment of the worker was modified by the phrase "by you or anyone else for their work performed for you."  Here, unlike in *Dry*, the issue is not whether one of two modifiers separated by a comma and a conjunction can be deemed to modify a term on the other side of the comma and conjunction.  Therefore, that facts in *Dry* are not synonymous with or even similar to the facts here such that the case is in any way instructive.

Second, as you note, "[l]anguage is ambiguous if it is reasonably open to different constructions."  *Jones v. Mid-Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. 2009) (quoting *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007)).  Here, the definition of Third Party



David E. Lawson
April 17, 2020
Page 4

Harassment Act is *not reasonably* open to different constructions under an objective standard, for the reasons discussed above, and therefore is not ambiguous.  Thus, "[a]bsent an ambiguity, an insurance policy must be enforced according to its terms."  *Id.* (citing *Rodriguez v. General Accident Ins. Co.*, 808 S.W.2d 379, 382 (Mo. 1991)).  Just as "[a] court is not permitted to create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate" (*Rodriguez*, 808 S.W.2d at 382), it is inappropriate and ineffective for you to attempt to do so here.  As such, your creative but grammatically incorrect argument is unpersuasive and does not render the definition ambiguous.

Based on the foregoing, StarNet continues to maintain its position, for the reasons set forth in our March 31st letter, that any Third Party Harassment Act alleged by Plaintiffs in the Lawsuit is part of a Lending Act.  Therefore, Insuring Agreement I does not apply.  Accordingly, StarNet maintains that no coverage is available for the Lawsuit under Insuring Agreement I.

B.    <u>No Coverage Is Available for the Lawsuit under Insuring Agreement K of the Policy.</u>

With respect to Insuring Agreement K, StarNet continues to maintain its position set forth in our March 31st letter that no Electronic Publishing Act is alleged in the Lawsuit and therefore that no coverage is available under Insuring Agreement K.

Notably, Insuring Agreement K provides that StarNet shall pay on behalf of the Directors, Officers, Employees and the Company, Loss which the Directors, Officers, Employees or the Company become legally obligated to pay as a result of any Claim first *made against them*, individually or otherwise, during the Policy Period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, *for an Electronic Publishing Act* taking place after the Retroactive Date, if any.  As such, coverage is only afforded under Insuring Agreement K (and under the Policy in general) for certain Claims for Wrongful Acts, including for an Electronic Publishing Act, *by the Insureds* (i.e., the Directors, Officers, Employees, or the Company).  That is, to trigger coverage under the insuring agreement, a Wrongful Act (i.e., an Electronic Publishing Act) by an Insured must be alleged.

In your letter, you rest your argument that this insuring agreement applies on the supposed "fact that credit reporting agencies publish credit information electronically."  That is, you concede that the credit reporting agency is the party, if any, that publishes credit information electronically, *not 1st Financial*.  Even though the Lawsuit is against 1st Financial, there is nothing in the original Petition or the First Amended Petition which amounts to allegations that 1st Financial, i.e., the Company, published or widely dispersed such information—nor is that an "actual fact" by any means.  Using the exact language in your letter, the fact that 1st Financial allegedly transmits credit information about its members to credit reporting agencies, which results in the same information being reported electronically by the credit agencies to their customers, does not trigger Insuring Agreement K.



David E. Lawson
April 17, 2020
Page 5

At most, 1st Financial would have reported Plaintiff's credit information to reporting agencies, and nowhere is it alleged—nor is it an "actual fact"—that such reporting is always done electronically, unlike in *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966 (8th Cir. 1999), in which the court held that it was apparent the allegations of defective shop welds that had to be repaired were allegations of "property damage."   For instance, 1st Financial could mail or otherwise transmit customers' credit information.  In any event, even if it is an "actual fact" that 1st Financial electronically transmitted the credit information to the credit reporting agencies, the act of merely transmitting credit information as required by law does not constitute "publishing" within the plain meaning of that term (i.e., to make information available for the public to view).

For these reasons, StarNet maintains that no Electronic Publishing Act is alleged in the Lawsuit and, thus, no coverage is available for the Lawsuit under Insuring Agreement K.

C.       Reservation of Rights

In addition to the defenses set forth above and in StarNet's prior correspondence, StarNet expressly reserves all of its rights and defenses under the Policy to modify its coverage positions based on any of the Policy terms, conditions, exclusions, or defenses set forth above or based on any other Policy term, condition, exclusion or defense that may be applicable as additional facts come to StarNet's attention.  Nothing herein shall be construed as a waiver of any rights or defenses that StarNet now has or hereafter may have under the Policy or at law.  StarNet recognizes that the Insured is similarly reserving rights.

Sincerely,

BAILEY CAVALIERI LLC

Thomas E. Geyer

cc:     Kurt Schultheis (kschultheis@berkleyfinsecure.com)
        Jordan Watrous (jwatrous@baileycav.com)

#1787779
13451.19978



# BAILEY | CAVALIERI

**THOMAS E. GEYER**
E tgeyer@baileycav.com
D 614.229.3206

April 29, 2020

**VIA E-MAIL (delarson@martinpringle.com)**

David E. Larson
Martin Pringle Attorneys at Law
One Main Plaza
4435 Main Street, Suite 920
Kansas City, MO 64111

|       |            |                                       |
|-------|------------|---------------------------------------|
| Re:   | Insurer:   | StarNet Insurance Company             |
|       | Insured:   | 1st Financial Federal Credit Union    |
|       | Policy No.:| MLP 6014300-11                        |
|       | Matter:    | Stuart Radloff, et al.                |
|       | Claim No.: | 107 07119                             |

Dear Mr. Larson:

As you know, we represent StarNet Insurance Company in connection with the above-referenced matter. By letter to you dated April 17, 2020 we addressed certain coverage issues for the above-referenced matter, in response to your letter dated April 6, 2020. We recently learned of a formatting mistake in the PDF version of our April 17th letter, and we now write to correct that mistake.

Specifically, the formatting of Policy Section 2.RR. on p. 2 of the April 17 letter was incorrect. This letter corrects that, and reflects the formatting of Policy Section 2.RR. as it appears in the Policy. Otherwise, the text of this letter is the same as the April 17th letter (other than these italicized introductory comments). We apologize for any confusion.

On behalf of StarNet Insurance Company ("StarNet"), we are in receipt of your April 6, 2020 letter in response to our March 31, 2020 letter regarding coverage for the lawsuit captioned *Stuart Radloff, et al. v. 1st Financial Federal Credit Union*, Case No. 1922-CC10792, Circuit Court of the City of St. Louis, State of Missouri (the "Lawsuit") under Management Liability Insurance Policy No. MLP 6014300-11 (the "Policy").[1]

---

[1] We are directing this letter to you as the authorized representative of 1st Financial Federal Credit Union ("1st Financial" or the "Company") under the Policy. If you are no longer acting on behalf of 1st Financial for insurance coverage purposes, please forward a copy of this letter to its authorized insurance representative and let us know with whom we should communicate regarding this matter.

Bailey Cavalieri LLC • 10 West Broad Street • Suite 2100 • Columbus, Ohio 43215-3422
P 614.221.3155  F 614.221.0479  W baileycav.com
ATTORNEYS AT LAW

23

David E. Lawson
April 29, 2020
Page 2

While StarNet has carefully considered the points raised in your April 6th letter, for the reasons set forth in our March 31st letter and as further discussed below, StarNet respectfully maintains that no coverage is available for the Lawsuit under either Insuring Agreement I or Insuring Agreement K.  The following addresses the primary points raised in your April 6th letter, in turn:

A.    No Coverage Is Available for the Lawsuit under Insuring Agreement I of the Policy.

Your characterization of the definition of "Third Party Harassment Act," and contention that Insuring Agreement I affords coverage for the Lawsuit, are simply incorrect.

In our March 31st correspondence, we did not transcribe the definition of the term "Third Party Harassment Act" in the exact format that it is presented in the Policy.  However, we now do so below, in order to dispel your inventive argument that this insuring agreement is applicable to the Lawsuit, and that the placement of a semicolon before or within the last clause of the provision is needed in order for StarNet's position to be correct.[2]

Section 2.RR. of the Policy states that:

> Third Party Harassment Act means any actual or alleged:
> a.   violation of any federal, state, provincial or local statutory law, common law or civil law prohibiting discrimination of any kind;
> b.   harassment, including any type of sexual, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment;
> c.   defamation, libel, slander, disparagement or invasion of privacy;
> d.   false arrest, false imprisonment or malicious prosecution; or
> e.   bullying
> of a natural person other than an Employee, Officer or Director and other than as a part of a Lending Act.

Importantly, the placement of the last phrase that begins "of a natural person" on a new line that is justified farther to the left than the text of the lettered subsections makes clear that that phrase applies to all of the preceding subsections, not just the term "bullying" in subsection e. (as you assert).  Your reading of the provision applying the phrase "of a natural person other than an Employee, Officer or Director and other than as part of a Lending Act" only to the term bullying is strained and inaccurate, not to mention grammatically distinct from the example definition you provide in your letter.

---

[2] Terms capitalized but not otherwise defined in this letter have the meanings assigned to them in the Policy.



David E. Lawson
April 29, 2020
Page 3

To that end, if your reading of the definition of Third Party Harassment Act was correct, Insuring Agreement I would afford coverage for the harassment, as set forth in subsections a. through d., *of* an Employee, Officer or Director.  Not only is such an outcome inconsistent with the "third party" nature of the definition and Insuring Agreement I, it would result in substantial overlap with the Employment Practices Liability insurance set out in Insuring Agreement H.

Further, under your proposed interpretation the Third Party Harassment Liability insuring agreement would afford coverage for loss incurred by an employee for harassment of that employee by another employee.  Your reading, therefore, cannot be correct because such harassment would not be "third party harassment" since harassment of any employee by another employee is not, under its plain meaning, harassment by a *third party* (i.e., an "outsider").  As such, that proposed interpretation is not what would be attached by an ordinary person of average understanding.

Your alternative argument that a semicolon is supposedly necessary after the term "Director" entirely ignores the placement of the "of a natural person" phrase on a new line that is justified farther to the left than the text of the lettered subsections.  If the "of a natural person" phrase, in whole or in part, was meant to apply only to the term bullying, it would not be on a new line, separated from the term bullying, and justified to the left.  The example you provide in your April 6th letter of the definition of the term "Plan" in the Policy is inapt.  A basic tenet of grammar is that a semicolon is used to separate independent clauses or sentences.  In the definition of the term Plan in the Policy, there is necessarily a semicolon before the word "provided" because the word "provided" starts a new, independent sentence.

To be sure, the clause "Plan should not include any multi-employer plan or employee stock ownership plan unless such plan is specifically listed as a Plan in an endorsement to this policy" is an independent sentence.  Conversely, the phrase in the definition of Third Party Harassment Act "of a natural person other than an Employee, Officer or Director and other than as a part of a Lending Act" is not an independent sentence and therefore does not need to be separated by a semicolon.  Several other definitions in the Policy are consistent with this grammatically correct formatting.  *See, e.g.,* Section 2.L. (definition of Employment Practices Act) and Section 2.SS. (definition of a Trust Act).  Indeed, the very purpose of the "other than" clause in the definition of Third Party Harassment Act is to make clear that acts intended to be covered by one insuring agreement (here, the Company Lender Liability Insuring Agreement) are not duplicatively covered by another insuring agreement.

Moreover, the propositions of law in the cases you rely upon in your letter do not support your contention that a semicolon is necessary or that any ambiguity exists here.

First, the *Dry* case you rely upon is inapposite.  As you describe in your letter, that case involved a definition of a term in an insurance policy that was not made up of various lettered subparts and did not contain (or supposedly have any missing) semicolons, but rather was a single sentence with two distinct portions or clauses that contained different modifying language.



David E. Lawson
April 29, 2020
Page 4

That is, the *Dry* court determined that the portion of the definition at issue discussing the scope of the worker's duties was modified by the phrase "by you," while the portion of the definition discussing payment of the worker was modified by the phrase "by you or anyone else for their work performed for you."  Here, unlike in *Dry*, the issue is not whether one of two modifiers separated by a comma and a conjunction can be deemed to modify a term on the other side of the comma and conjunction.  Therefore, that facts in *Dry* are not synonymous with or even similar to the facts here such that the case is in any way instructive.

Second, as you note, "[l]anguage is ambiguous if it is reasonably open to different constructions." *Jones v. Mid-Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. 2009) (quoting *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007)).  Here, the definition of Third Party Harassment Act is *not reasonably* open to different constructions under an objective standard, for the reasons discussed above, and therefore is not ambiguous.  Thus, "[a]bsent an ambiguity, an insurance policy must be enforced according to its terms." *Id.* (citing *Rodriguez v. General Accident Ins. Co.*, 808 S.W.2d 379, 382 (Mo. 1991)).  Just as "[a] court is not permitted to create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate" (*Rodriguez*, 808 S.W.2d at 382), it is inappropriate and ineffective for you to attempt to do so here.  As such, your creative but grammatically incorrect argument is unpersuasive and does not render the definition ambiguous.

Based on the foregoing, StarNet continues to maintain its position, for the reasons set forth in our March 31st letter, that any Third Party Harassment Act alleged by Plaintiffs in the Lawsuit is part of a Lending Act.  Therefore, Insuring Agreement I does not apply.  Accordingly, StarNet maintains that no coverage is available for the Lawsuit under Insuring Agreement I.

B.      No Coverage Is Available for the Lawsuit under Insuring Agreement K of the Policy.

With respect to Insuring Agreement K, StarNet continues to maintain its position set forth in our March 31st letter that no Electronic Publishing Act is alleged in the Lawsuit and therefore that no coverage is available under Insuring Agreement K.

Notably, Insuring Agreement K provides that StarNet shall pay on behalf of the Directors, Officers, Employees and the Company, Loss which the Directors, Officers, Employees or the Company become legally obligated to pay as a result of any Claim first *made against them*, individually or otherwise, during the Policy Period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, *for an Electronic Publishing Act* taking place after the Retroactive Date, if any.  As such, coverage is only afforded under Insuring Agreement K (and under the Policy in general) for certain Claims for Wrongful Acts, including for an Electronic Publishing Act, *by the Insureds* (i.e., the Directors, Officers, Employees, or the Company).  That is, to trigger coverage under the insuring agreement, a Wrongful Act (i.e., an Electronic Publishing Act) by an Insured must be alleged.



26

David E. Lawson
April 29, 2020
Page 5

In your letter, you rest your argument that this insuring agreement applies on the supposed "fact that credit reporting agencies publish credit information electronically." That is, you concede that the credit reporting agency is the party, if any, that publishes credit information electronically, *not 1st Financial*. Even though the Lawsuit is against 1st Financial, there is nothing in the original Petition or the First Amended Petition which amounts to allegations that 1st Financial, i.e., the Company, published or widely dispersed such information—nor is that an "actual fact" by any means. Using the exact language in your letter, the fact that 1st Financial allegedly transmits credit information about its members to credit reporting agencies, which results in the same information being reported electronically by the credit agencies to their customers, does not trigger Insuring Agreement K.

At most, 1st Financial would have reported Plaintiff's credit information to reporting agencies, and nowhere is it alleged—nor is it an "actual fact"—that such reporting is always done electronically, unlike in *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966 (8th Cir. 1999), in which the court held that it was apparent the allegations of defective shop welds that had to be repaired were allegations of "property damage." For instance, 1st Financial could mail or otherwise transmit customers' credit information. In any event, even if it is an "actual fact" that 1st Financial electronically transmitted the credit information to the credit reporting agencies, the act of merely transmitting credit information as required by law does not constitute "publishing" within the plain meaning of that term (i.e., to make information available for the public to view).

For these reasons, StarNet maintains that no Electronic Publishing Act is alleged in the Lawsuit and, thus, no coverage is available for the Lawsuit under Insuring Agreement K.

*     *     *



David E. Lawson
April 29, 2020
Page 6


C.      Reservation of Rights

        In addition to the defenses set forth above and in StarNet's prior correspondence, StarNet expressly reserves all of its rights and defenses under the Policy to modify its coverage positions based on any of the Policy terms, conditions, exclusions, or defenses set forth above or based on any other Policy term, condition, exclusion or defense that may be applicable as additional facts come to StarNet's attention.   Nothing herein shall be construed as a waiver of any rights or defenses that StarNet now has or hereafter may have under the Policy or at law.   StarNet recognizes that the Insured is similarly reserving rights.

                            Sincerely,

                            BAILEY CAVALIERI LLC


                            Thomas E. Geyer

cc:     Kurt Schultheis (kschultheis@berkleyfinsecure.com)
        Jordan Watrous (jwatrous@baileycav.com)


#1793282
13451.19978


**BAILEY | CAVALIERI**