## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| ALLTRU FEDERAL CREDIT UNION, f/k/a ) <br> 1st FINANCIAL CREDIT UNION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STARNET INSURANCE COMPANY, ) <br> ) <br> Defendant. ) | Case No. 4:21-CV-01334-JAR |

### MEMORANDUM AND ORDER

This is an action seeking insurance coverage and related damages. Plaintiff Alltru Federal Credit Union, f/k/a 1st Financial Credit Union ("Alltru") seeks to enforce its insurer's alleged coverage obligations for damages incurred litigating and settling a consumer class action lawsuit filed against it in state court. Defendant Starnet Insurance Company ("Starnet") moves to dismiss, arguing there was no potential for coverage under its policy and therefore no duty to defend Alltru from the underlying claims or to indemnify it against the resulting damages. (Doc. No. 9). The motion is fully briefed and ready for disposition.

**I.   Background**

During the relevant time period, Alltru, a federally chartered credit union, was insured by StarNet under Management Liability Insurance Policy number MLP 6014300-11 ("the Policy"). The Policy insured Alltru against loss resulting from, among other things, a "lending act" through coverage labeled "Company Lender Liability" (Insuring Agreement E) with a policy limit of $250,000; loss resulting from a "third-party harassment act" through coverage labeled "Third Party Harassment Liability" (Insuring Agreement I) with a policy limit of $1 million; and

loss resulting from an "electronic publishing act" through coverage labeled "Electronic Publishing" (Insuring Agreement K) with a policy limit of $1 million.

In July 2019, a consumer class action lawsuit was filed against Alltru in the Circuit Court of St. Louis City, Missouri (the "Underlying Lawsuit") alleging that Alltru failed to issue UCC-compliant notices pertaining to repossessed collateral for consumer loans. The class members further alleged that Alltru reported false and derogatory credit information related to the repossessions to consumer credit reporting agencies. The class members alleged that they suffered property damages from the loss of use of tangible property, as well as personal injury damages in the form of defamation and harm to credit worthiness.

Alltru notified Starnet of the Underlying Lawsuit and made demand on Starnet to defend and indemnify Alltru for the resulting damages. In response, Starnet issued an initial reservation of rights letter agreeing to defend Alltru but reserving its rights to deny coverage. On March 11, 2020, Starnet acknowledged coverage under Insuring Agreement E, but declined coverage under Insuring Agreements I and K.

Alltru ultimately settled the Underlying Lawsuit with a cash fund of $4,750,000 and then filed this action against Starnet in the Circuit Court of St. Charles County, Missouri. Alltru alleges claims for breach of contract (Count I); bad faith refusal to defend and indemnify (Count II); and vexatious refusal to pay (Count III). Starnet removed the case to this Court on November 10, 2021 based upon diversity of citizenship (Doc. No. 1) and then moved to dismiss. (Doc. No. 9).[1]

---

[1] Briefing on Starnet's motion to dismiss was stayed on January 6, 2022 pending approval of the final settlement by the state court in the Underlying Lawsuit. (Doc. No. 14). Following the state court's preliminary approval of the settlement on March 15, 2022, Alltru requested the stay be lifted for purposes of completing the briefing on Starnet's motion to dismiss. There being no opposition from Starnet, the Court vacated the stay. (Doc. No. 16). On June 6, 2022, Alltru notified the Court and Starnet of the state court's final approval of the underlying class action settlement. (Doc. No. 23).

**II.     Legal standard**

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. See also Cole v. Homier Dist. Co., Inc., 599 F.3d 856, 861 (8th Cir. 2010). For purposes of a Rule 12(b)(6) motion to dismiss, the court must accept the allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Cole, 599 F.3d at 861(quoting Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005)).

When faced with issues of insurance coverage, courts under Missouri law compare the allegations of the underlying complaint to the language of the insurance policy. Reliance Ins. Co. v. Shenandoah S., Inc., 81 F.3d 789, 791-92 (8th Cir. 1996) (citation omitted). "The insurer owes no duty of defense where  … the allegations of the claimant's petition and the insurance contract demonstrate that coverage does not apply." Id. If the petition or complaint against the insured alleges facts not within the coverage of the insurance policy, no duty devolves upon the insurer. Id. at 792. "The duty to defend is triggered if there exists facts, known or which should be known by the insurer, which could potentially bring the underlying claim within coverage." Id. (citing Farm Bureau Town & Country Ins. Co. v. Turnbo, 740 S.W.2d 232 (Mo. Ct. App. 1987)). Where there is no duty to defend, there is no duty to indemnify. Anheuser Busch Employee Credit Union v. Travelers Prop. Cas. Co. of Am., No. 4:18-CV-1208 CDP, 2020 WL 1675685, at *2 (E.D. Mo. Apr. 6, 2020).  Any uncertainty as to the policy's coverage should be decided in favor of the insured. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 621 (8th Cir. 1981).

### III.    Policy provisions

**Insuring Agreement E,** "Company Lender Liability," covers:

loss which the [insured] company or [its] employees become legally obligated to pay as a result of any claim first made against them, individually or otherwise, during the policy period, the Automatic Reporting Period, or, if exercised, the Extended Reporting Period, for a lending act taking place after the retroactive date, if any.

The Policy defines a "lending act" as:

… any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a director, officer, employee or the company, in connection with or relating to:

a. an agreement to or refusal to grant or extend a loan, lease or extension of credit;
b. the granting or extending of a loan, lease or extension of credit;
c. loan servicing, including the servicing of loans for others under a contract or agreement; or
d. the restructure, termination, transfer, repossession or foreclosure of a loan, lease or extension of credit.

**Insuring Agreement I,** "Third Party Harassment Liability," covers

loss which the directors, officers, employees or the company become legally obligated to pay as a result of any claim first made against them … for a third-party harassment act taking place after the retroactive date, if any.

The Policy defines a "third-party harassment act" as:

… any actual or alleged:

a. violation of any federal, state, provincial or local statutory law, common law or civil law prohibiting discrimination of any kind;
b. harassment, including any type of sexual, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment;
c. defamation, libel, slander, disparagement or invasion of privacy;
d. false arrest, false imprisonment or malicious prosecution; or
e. bullying
   of a natural person other than an employee, officer or director and other than as a part of a lending act.

4

> **Insuring Agreement K,** "Electronic Publishing Liability," covers
>
> loss which the directors, officers, employees or the company become legally obligated to pay as a result of any claim first made against them … for an electronic publishing act taking place after the retroactive date, if any.

The Policy defines an electronic publishing act as:

> … any actual or alleged
>
> a. **libel or slander resulting from the electronic publishing of material that defames a person** or organization or disparages the goods, products or services of a person or organization (emphasis added);
> b. plagiarism, false light or false advertising, resulting from electronic publishing activities;
> c. **violation of the right of privacy** or right of publicity of any person or organization by the electronic publishing of material that **publicly discloses private facts** or commercially appropriates the name or likeness of such person or organization (emphasis added);
> d. infringement of a copyright, title, trademark, trade dress, trade name, service mark, service name or slogan via electronic publishing activities; or
> e. unauthorized use of titles, formats, performances, style, characters, plots or other protected material via electronic publishing activities.

**IV.   Discussion**

The issue for the Court's determination is whether Alltru has stated sufficient factual allegations to plausibly show a potential for coverage under the Policy. Starnet argues that the Underlying Lawsuit alleges only "lending acts," i.e., an "error, misstatement, misleading statement, act, omission, neglect, or breach of duty" by the company or company personnel "in connection with or relating to … (d) the restructure, termination, transfer, repossession or foreclosure of a loan, lease or extension of credit." Therefore, there is no possibility of coverage under the Policy other than what it has already provided under Insuring Agreement E. In response, Alltru contends that the Underlying Lawsuit pleads defamation and invasion of privacy claims that are within the scope of coverage afforded by Insuring Agreements I and K.

5

Alternatively, Alltru argues that a justiciable controversy exists regarding Starnet's coverage obligations.

Under Missouri law, which applies in this diversity case, the rules governing the interpretation of insurance policies are well settled. A court must apply the general rules of contract construction when interpreting an insurance policy, because insurance policies are contracts. Jaudes v. Progressive Preferred Ins. Co., 11 F. Supp. 3d 943, 949 (E.D. Mo. 2014) (citation omitted). A court must give the contract terms their plain and ordinary meaning, unless a term is defined in the policy or is ambiguous and apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." Id. (quoting Burns v. Smith, 303 S.W.3d 505, 509 (Mo. 2010)). In addition, courts should not interpret policy provisions in isolation but rather read insurance contracts "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." Lafollette v. Liberty Mut. Fire Ins. Co., 139 F. Supp. 3d 1017, 1021 (W.D. Mo. 2015) (quoting Thiemann v. Columbia Pub. Sch. Dist., 338 S.W.3d 835, 840 (Mo. Ct. App. 2011)). Finally, insurance policies are to be given a reasonable construction and interpreted to afford coverage rather than to defeat coverage. Seoul Taco Holdings, LLC v. Cincinnati Ins. Co., 538 F. Supp. 3d 926, 931-32 (E.D. Mo. 2021) (citing Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc., 54 S.W.3d 661, 667 (Mo. Ct. App. 2001)).

The key is whether the contract language is ambiguous or unambiguous. Jaudes, 11 F. Supp. 3d at 949. The mere fact that the parties disagree over the interpretation of the terms of a contract does not create an ambiguity. Fluor Corp. v. Zurich Am. Ins. Co., 550 F. Supp. 3d 764, 774 (E.D. Mo. 2021) (citation omitted). A policy provision is ambiguous "when there is duplicity, indistinctness, or uncertainty in the meaning of the language" that leaves the provision

6

"reasonably open to different constructions." Id. (quoting Burns v. Smith, 303 S.W.3d 505, 512 (Mo. 2010)). If an ambiguity exists, then the policy language will be construed against the insurer. Lafollette, 139 F. Supp. 3d at 1021 If, however, the policy is unambiguous, the court must enforce the contract's terms as written.

**Insuring Agreement I**

Starnet first argues that Alltru's complaint must be dismissed because the Underlying Lawsuit does not allege a "third party harassment act" as defined under Insuring Agreement I. The Policy defines a "third party harassment act" as:

> … any actual or alleged:
>
> a. violation of any federal, state, provincial or local statutory law, common law or civil law prohibiting discrimination of any kind;
> b. harassment, including any type of sexual, religious, racial, sexual orientation, pregnancy, disability, age, or national origin-based harassment;
> c. ***defamation, libel, slander, disparagement or invasion of privacy***;
> d. false arrest, false imprisonment or malicious prosecution; or
> e. bullying
>
> of a natural person other than an employee, officer or director and ***other than as a part of a lending act.***

(Emphasis added).

Starnet contends that the phrase "other than as part of a lending act" modifies subsections a. through e. of the definition and that because the alleged "defamation, libel, slander, disparagement or invasion of privacy" occurred as part of a "lending act," i.e., financing activities attributable to vehicle repossessions, it does not fall within the Policy definition of a "third party harassment act." In support of its contention, StarNet invokes the "series-qualifier canon," which provides that " '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the

7

entire series.' " Facebook, Inc. v. Duguid, 141 S. Ct. 1163, 1169 (2021) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012)).

In response, Alltru appears to invoke the "rule of the last antecedent," which provides that "a limiting phrase that follows a list of terms or phrases ordinarily is "read as modifying only the noun or phrase that it immediately follows." United States v. Loyd, 886 F.3d 686, 687-88 (8th Cir. 2018) (quoting Barnhart v. Thomas, 540 U.S. 20, 26 (2003)). Alltru notes that semicolons were used to denote the end of the clauses in subsections a. through d., but not in subsection e, meaning that the phrase "other than as a part of a lending act" would apply only to subsection e., "bullying." Therefore, Alltru contends the class plaintiffs' claims for defamation would meet the definition of a "third party harassment act." Alternatively, Alltru argues that the absence of a semicolon makes the "other than" clause ambiguous such that the Policy's language should be construed against Starnet.

Interpretive canons like these are not "inflexibly and uniformly binding" rules, but rather "another aid to discovery of intent or meaning." United States for Use & Benefit of Cent. S. Constr. Corp. v. Gulf Bldg., 568 F. Supp. 3d 1395, 1400 (S.D. Ga. 2021) (citation omitted). "The important point is that interpretive canons attempt to identify the way in which 'a reasonable reader, fully competent in the language, would have understood the text at the time it was issued.' " Facebook, 141 S. Ct. at 1173, 1175 (Alito, J., concurring). Likewise, punctuation – while not controlling – is to be considered to the extent it aids in interpreting the meaning of language, such as aiding in the determination of what preceding phrases or phrase is modified by a succeeding phrase. Fluor Corp. v. Zurich Am. Ins. Co., 550 F. Supp. 3d 764, 776 (E.D. Mo. 2021) (citing Dry v. United Fire & Cas. Co., Inc., 420 S.W.3d 593 (Mo. Ct. App. 2013)); see also John Drennon & Sons Co. v. New Hampshire Ins. Co., 637 S.W.2d 339, 341 (Mo. Ct. App.

8

1982). At the end of the day, whether a modifier applies to an entire list or just the nearest antecedent sometimes "has little to do with syntax[,] and everything to do with our common understanding" of what words likely mean in a given context. Facebook, 141 S. Ct. at 1174 (Alito, J., concurring).

With these principles in mind, and after considering the phrase "of a natural person other than an employee, officer or director and other than as a part of a lending act" within the context of the Policy definition, the Court finds that an ordinary person of average understanding would construe the phrase as modifying each paragraph in the series. See Loyd, 886 F.3d at 688 (The series-qualifier canon "requires a modifier to apply to all items in a series when such an application would represent a natural construction."). Thus, any alleged defamation, libel, slander, disparagement or invasion of privacy does not constitute a third party harassment act when it is "part of a lending act." Furthermore, Alltru offers no reason for applying the limiting phrase only to "bullying." If Starnet had intended to modify only bullying, it could have put the modifying phrase on the same line. See Wong v. Minn. Dep't of Human Servs., 820 F.3d 922, 929 (8th Cir. 2016) (quoting United States v. Bass, 404 U.S. 336, 341 (1971)) (The series-qualifier canon trumps the rule of the last antecedent when there is " 'no reason consistent with any discernible purpose of the statute to apply' the limiting phrase to the last antecedent alone.").

Alltru argues that even if the lending act restriction is deemed to apply, it is still entitled to coverage under Insuring Agreement I because the conduct giving rise to the class members' defamation and slander claims, i.e., the reporting of credit information, is not a "lending act" as defined by the Policy. Alternatively, Alltru suggests that the Policy's definition of a "lending act" is ambiguous.

The Policy defines a "lending act" as:

9

> … any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by a director, officer, employee or the company, *in connection with or relating to*:
>
> a. an agreement to or refusal to grant or extend a loan, lease or extension of credit;
> b. the granting or extending of a loan, lease or extension of credit;
> c. loan servicing, including the servicing of loans for others under a contract or agreement; or
> d. the restructure, termination, transfer, *repossession or foreclosure of a loan, lease or extension of credit*.

(Emphasis added). Starnet argues that all of the wrongs alleged in the Underlying Lawsuit are wrongs "in connection with" or "relating to" an Alltru loan for the purchase of a motor vehicle. Therefore, any alleged defamation, slander, libel, or invasion of privacy is directly tied to each class member's loan, the servicing thereof, and the repossession of the collateral for that loan, citing Bank of Camilla v. St. Paul Mercury Ins. Co., 939 F. Supp. 2d 1299, 1307-08 (M.D. Ga. 2013) (addressing an almost identical definition of "lending act")[2].

Alltru responds that the claims for defamation, slander and libel arose from the reporting of false information to credit reporting agencies and argues that if a "lending act" is construed to encompass all credit reporting, then "everything a credit union does would fall within the definition and effectively nullify all coverage under this agreement." Starnet replies that courts

---

[2] The policy definition provided:

> Lending Act means, only with respect to a loan, lease, or extension of credit, any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed by an insured Person on behalf of the Company or the Company, in connection with or relating to:
>
> a. an agreement or refusal to grant or extend any such loan, lease or extension of credit;
> b. the granting or extending of any such loan, lease, or extension of credit;
> c. loan servicing, but only for such loan, lease, or extension of credit in which the Company has an ownership interest; or
> d. the restructure, termination, transfer, repossession or foreclosure of any such loan, lease, or extension of credit.

Bank of Camilla, 939 F. Supp. 2d at 1306.

have rejected attempts like Alltru's to separate ancillary alleged misconduct from the actual vehicle repossession, citing Anheuser Busch Emp. Credit Union, 2020 WL 1675685, at *3 ( "The fundamental premises of ABECU's argument – that the asserted 'loss of use' damages are conceptually and legally severable from the act of repossession which causes the loss of use – has been addressed and squarely rejected by courts[.]").

The Court is persuaded by the reasoning of the court in Bank of Camilla, 939 F. Supp. 2d at 1307-08. In that case, the defendant insurer argued that a "lending act" could not be truly independent of the underlying credit extension or loan grant because the policy language required the wrongful act to occur "with respect to," "in connection with," or "relating to" the underlying act. "In other words, [d]efendant would have 'lending act' mean any inaction or action that: (1) occurred 'with respect to,' 'in connection with,' or 'relating to' the underlying credit extension or loan grant; and (2) falls under the auspices of an "error, misstatement, misleading statement, act, omission, neglect, or breach of duty." Id. at 1306. The insured bank argued that the phrases "with respect to," "in connection with," or "relating to" are addressed to situations in which the bank – by some independent conduct apart from simply making a loan – acts improperly toward or breaches a duty owed to its customer in the process of extending credit to that customer, such as making a material misrepresentation or omission in a loan document or procuring a fraudulent appraisal report. Id. at 1306-07.

The court rejected the bank's argument, finding the policy terms clear, precise, and unambiguous and open to only one reasonable interpretation – a broad reading of what constitutes a "lending act" that is not limited to "independent conduct." Id. at 1307. "The phrases 'with respect to,' 'in connection with,' or 'relating to,' by their plain meaning, discredit [insured's] contention that a lending act must be independent from the underlying loan grant or

11

credit extension, as each phrase binds the lending act to the underlying credit extension or loan grant. To require the three phrases to mean 'independent' renders the phrases meaningless." Id.

Missouri courts likewise give phrases such as "in connection with" and "relating to" a broad meaning, including in insurance policies. See Wilbers v. Moneta Grp. Inv. Advisors, Inc., No. 406CV00005 ERW, 2006 WL 1360866, at *2 (E.D. Mo. May 17, 2006). The fact that the parties disagree over the interpretation of the terms of a contract does not create an ambiguity. Fluor, 550 F. Supp. 3d at 774.

In the absence of an accepted and more narrow interpretation, the Court finds there is no potential for coverage under Insuring Agreement I based on the allegations of the complaint in the Underlying Lawsuit. Therefore, Starnet had no duty to defend Alltru from the underlying claims or indemnify it against the resulting damages. Starnet's motion to dismiss will be granted as to Insuring Agreement I.

**Insuring Agreement K**

Next, Starnet argues the complaint must be dismissed because the Underlying Lawsuit does not allege libel or slander or invasion of privacy from an "electronic publishing act," but rather an "oral or written publication."[3] Starnet further argues the complaint does not allege a violation of privacy based on the public disclosure of private facts since any alleged disclosure by Alltru to between one and three credit reporting agencies is not disclosure to the general public or a large number of persons. See Blakeney v. City of Pine Lawn, Missouri, No. 4:19-CV-02017-SNLJ, 2021 WL 1057296, at *1 (E.D. Mo. Mar. 18, 2021) (citation omitted). Moreover,

---

[3] The complaint in the Underlying Lawsuit alleged that Alltru reported "false or inaccurate derogatory information" on the credit reports of class members by way of "oral or written publication of material that defames, slanders, or libels the class members." (Doc. No. 4-1 at ¶ 30). The complaint further alleges that Alltru's reporting of such "false or inaccurate derogatory information" was "oral or written publication of material that invaded the … privacy rights" of the class. (Id. at ¶ 31).

12

even if the complaint did make such allegations, Starnet contends there is no claim for which libel, slander, or invasion of privacy damages are recoverable. This is because the only claims alleged in the Underlying Lawsuit are state law UCC-based claims which are preempted by the Fair Credit Reporting Act ("FCRA") unless malice or willful intent to injure the consumer is alleged. No such allegations were made in the Underlying Lawsuit. (See Doc. No. 4-1 at ¶¶ 32, 33, 39, 40).

In response, Alltru argues that the claims in the Underlying Lawsuit concern the electronic transmission of false credit information to credit reporting agencies and refers to the description of released claims in the class action settlement agreement, which includes "any claim related to or arising out of Alltru's *electronic delivery and publication* to three credit reporting agencies information which was inaccurate and harmful to the credit of Class Members[.]" (See Doc. No. 19-4 at 8) (emphasis added).

The parties disagree as to whether the settlement agreement, attached to Alltru's memorandum in opposition to Starnet's motion to dismiss, is necessarily embraced by Alltru's complaint and thus subject to consideration at the motion to dismiss stage. In any event, in the context of credit reporting, the communications being referenced may by inference necessarily include electronic transmissions. The Court cannot resolve this factual matter on a motion to dismiss.

With regard to the invasion of privacy allegation in the Underlying Lawsuit, Starnet argues that any alleged disclosure by Alltru to credit reporting agencies does not constitute public disclosure, especially given the limited access to credit reports by law. Alltru responds that credit unions routinely electronically transmit credit reports on borrowers to credit reporting agencies, which in turn compile credit information on individuals and make it available to banks

and lenders thereby constituting public disclosure. Again, these are factual matters that cannot be resolved at this stage of the proceedings.

Starnet further argues that even if Alltru has alleged an "electronic publishing act," it still cannot establish coverage under Insuring Agreement K because the Underlying Lawsuit fails to establish a "loss" that Alltru was "legally obligated to pay." The Policy defines a "loss" as:

> any amount which an insured becomes legally obligated to pay as a result of a claim, including punitive, exemplary or multiple damages in excess of actual damages (except where uninsurable by law), judgments, settlement, pre-judgment and post-judgment interest, and reasonable defense expenses; however loss does not include:
>
> > (a) any unrepaid, unrecoverable or outstanding loan, lease or extension of credit;
> > (b) any costs incurred to comply with any injunctive or nonmonetary relief or any agreement to provide such relief; or
> > (c) matters uninsurable under the law pursuant to which this policy is construed.

Starnet contends that because FCRA preempts state law tort claims unless malice or intent to injure is alleged, and because there were no such allegations, Alltru settled claims for which it had no liability under FCRA, and thus did not incur a "loss."

Starnet's argument ignores the Policy's clear and unambiguous definition of "loss," i.e., "any amount which an insured becomes legally obligated to pay as a result of a … settlement." A settlement agreement is a contract that creates legally enforceable obligations. Because of the class action settlement agreement in the Underlying Lawsuit, Alltru was legally obligated to pay damages to the class members. See Busch Properties, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA., 815 F.3d 1123, 1127 (8th Cir. 2016), as amended (Mar. 9, 2016) ("Missouri law … recognizes a claim and a settlement agreement as sufficient to establish that an insured is legally obligated to pay damages."). Thus, Alltru has alleged sufficient facts to plausibly show a

14

potential for coverage under Insuring Agreement K. Starnet's motion to dismiss will be denied as to Insuring Agreement K.

**Conclusion**

For all these reasons, the Court concludes there was no possibility of coverage under Insuring Agreement I because the damages claimed in the Underlying Lawsuit were not caused by a "third party harassment act." Thus, Starnet had no duty to defend or indemnify Alltru under Insuring Agreement I. The Court cannot conclude, however, that there was no possibility of coverage under Insuring Agreement K based on the allegations in the Underlying Lawsuit. Questions of fact exist as to whether the damages claimed were caused by an "electronic publishing act." Starnet's motion to dismiss will be granted as to Insuring Agreement I and denied as to Insuring Agreement K.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Starnet Insurance Company's Motion to Dismiss [9] is **GRANTED in part** and **DENIED in part** in accordance with the rulings herein.

**IT IS FURTHER ORDERED** that a scheduling conference will be set by separate order.

Dated this 27th day of September, 2022.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE